# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 11, 2007       Decided June 20, 2008

No. 04-3092

UNITED STATES OF AMERICA,
APPELLEE

v.

PAUL ASKEW,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 04cr00010-01)

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs were *A.J. Kramer*, Federal Public Defender, and *Sharon R. Rice*, Assistant Federal Public Defender.

*Blair G. Brown*, *Jonathan E. Nuechterlein*, and *Sambhav N. Sankar* were on the brief for *amicus curiae* National Association of Criminal Defense Lawyers in support of appellant.

*Florence Y. Pan*, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were *Jeffrey A. Taylor*, U.S. Attorney, and *Roy W. McLeese, III*, Assistant U.S. Attorney.

2

Before:  SENTELLE, *Chief Judge*, GINSBURG,[*] HENDERSON, RANDOLPH, ROGERS, TATEL, GARLAND, BROWN, GRIFFITH, and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS, with whom *Circuit Judges* ROGERS, TATEL, and BROWN join, and with whom *Circuit Judge* GRIFFITH joins except as to Part III.D, and with whom *Circuit Judges* GINSBURG and GARLAND join as to Parts I, III.D, III.E, and IV.

Concurring opinion filed by *Circuit Judge* GRIFFITH, with whom *Circuit Judges* ROGERS and TATEL join, except as to footnote 2.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH, with whom *Chief Judge* SENTELLE and *Circuit Judges* HENDERSON and RANDOLPH join.

EDWARDS, *Senior Circuit Judge*:   On the evening of December 19, 2003, police officers received a broadcast "lookout" for an armed robber.  Appellant Paul Askew, who wore clothing similar, but not identical to that described in the lookout, was stopped.  The police then conducted a *Terry* "frisk" which produced nothing.   Some time after the frisk was completed, the police moved appellant to a place where he could be seen by the complaining witness.  The officers' purpose was to determine whether the complainant could identify appellant as her assailant.  The District Court's findings of fact indicate that appellant complied during the stop and was not handcuffed during the identification show-up.  Preparatory to the show-up, but without appellant's consent, one of the officers attempted to unzip appellant's outer jacket to reveal to the complainant what appellant had on under the jacket.  The officer's unfastening of the jacket was interrupted when the zipper hit a hard object at

_____

[*] Judge Ginsburg was Chief Judge at the time of oral argument.

appellant's waist. Appellant then pushed the officer's hand away from his jacket. These latter events aroused the officer's suspicion, but the officer did nothing and the show-up continued. Although appellant was not implicated by the complaining witness, the police officers continued to detain him, walked him backwards towards a police vehicle, placed him on the hood of the car, and then fully unzipped his jacket. The officers found a gun in an open waist pouch and arrested appellant.

In April 2004, after the District Court denied his Fourth Amendment motion to suppress the Government's evidence, appellant entered a conditional guilty plea to a one-count indictment charging him with possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Appellant reserved his right to appeal the District Court's denial of his motion to suppress. *See* FED. R. CRIM. P. 11(a)(2). On June 29, 2004, the District Court sentenced appellant to 36 months' imprisonment, followed by three years' supervised release. Gov't *En Banc* Br. at 2; Appellant *En Banc* Br. at 2.

On April 6, 2007, a divided panel of the court affirmed the District Court's denial of appellant's motion to suppress. On July 12, 2007, the panel's judgment was vacated and an order was issued granting appellant's petition for rehearing *en banc*. The order granting *en banc* review instructed the parties to address the following issue:

> [W]hether during a *Terry* stop police officers may unzip a suspect's jacket solely to facilitate a show-up. In addressing this question, the parties should consider whether the officers' action was a lawful search under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny.

*United States v. Askew*, No. 04-3092, Order Granting *En Banc* Review (D.C. Cir. July 12, 2007). The order made clear that the only issue before the *en banc* court was whether the first, partial

unzipping was unlawful. There is no dispute that if the partial unzipping was unlawful, the discovery of the hard object at appellant's waist during that unzipping cannot justify the second full unzipping that yielded the gun.

On April 10, 2008, after oral arguments were heard by the *en banc* court, an order was issued instructing the parties to submit supplemental briefs addressing the following questions:

1.  Assuming, arguendo, that it is not dispositive that the unzipping was a search, was the gun evidence nonetheless *inadmissible* as the product of steps taken to facilitate a show-up witness' identification, on a theory that there were not reasonable grounds for believing that unzipping the jacket would establish or negate the suspect's connection with the crime under investigation?

2.  Was the gun evidence *admissible* as the product of a valid protective search, on a theory that regardless of the officer's subjective intent the initial unzipping was an objectively reasonable response to the suspect's conduct during the pat-down?

3.  Was the gun evidence *admissible* under the doctrine of inevitable discovery, on a theory that the officers had not completed the pat-down but would have done so after the show-up?

*United States v. Askew*, No. 04-3092, Order (directing supplemental briefing) (D.C. Cir. Apr. 10, 2008).

As described in its opening brief, the Government submits that the principal question for this court is whether the police "violate[d] appellant's Fourth Amendment rights by partially unzipping [his] outer jacket during a show-up identification procedure, so that a robbery victim could see whether appellant's sweatshirt matched that of the robbery perpetrator."

Gov't *En Banc* Br. at 13; *see also id.* at 22, 24. Applying *Minnesota v. Dickerson*, 508 U.S. 366 (1993), and the precedent on which it rests, to the District Court's uncontested findings of fact, a five-judge plurality of this court concludes that the answer to this question is yes. Because the police officer's unzipping of appellant's jacket went beyond what was necessary to protect the investigating officers or others nearby, it amounted to precisely the sort of evidentiary search that is impermissible in the context of a *Terry* stop.

Even assuming, *arguendo*, that an unzipping to facilitate a show-up is permissible under some circumstances, a majority of the court is nonetheless satisfied that the police officer's actions cannot be justified here since there were no reasonable grounds for believing that the unzipping would establish or negate appellant's identification as the robber in question.[1] A majority of the court is also satisfied that the Government's alternative argument, that the search of appellant can be justified as an objectively reasonable continuation of the protective frisk, is both contrary to the District Court's factual findings and unsupportable on any plausible reading of the record.

Finally, the Government concedes that "[t]he gun is not admissible under a theory of 'inevitable discovery.'" Gov't Supplemental Br. at 12. As the Government explains, it "did not make an inevitable-discovery argument before the district court, and thus failed to elicit" the testimony necessary to support such a theory under *Nix v. Williams*, 467 U.S. 431 (1984). Gov't Supplemental Br. at 14. Moreover, the Government acknowledges that "[b]ecause the inevitable-discovery theory raises factual issues that could have been addressed at the

---

[1] In this respect, assuming, *arguendo*, that an unzipping to facilitate a show-up is permissible under some circumstances, a majority of the court has resolved the legal question about the permissible scope of police activity at show-ups.

suppression hearing but were not, [it does] not believe that [it is] in a position to request a remand for further development of the record." *Id*. at 15 n.7.

## I. THE DISTRICT COURT'S FACTUAL FINDINGS

Following completion of the hearing on appellant's suppression motion, the District Court set forth its factual findings in a published opinion. *See United States v. Askew*, 313 F. Supp. 2d 1 (D.D.C. 2004). "[A]ppellate courts must constantly have in mind that their function is not to decide factual issues *de novo*." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985) (quotation marks omitted). Thus, as the Government rightly points out, "[t]his court must accept the district court's findings of fact unless clearly erroneous." Gov't *En Banc* Br. at 15. This rule is firmly entrenched in Supreme Court precedent, *see Ornelas v. United States*, 517 U.S. 690, 699 (1996), and in applying it we "overstep[] the bounds of [our] duty . . . if [we] undertake[] to duplicate the role of the lower court," *Bessemer City*, 470 U.S. at 573. This is especially so when, as here, the trial court is required to reconcile differences in testimony in order to make factual findings. *See* Mar. 26 Tr. at 29-31; *see generally Bessemer City*, 470 U.S. at 573-76.

Notably, neither party challenged the District Court's findings in this case. In fact, in its brief filed with the panel, the Government characterized the District Court's factual findings as "consistent with the government's evidence at the suppression hearing." Gov't Panel Br. at 9. Even if those findings had been challenged, we could not overturn them unless we were "definitely and firmly convinced that a mistake [had] been committed." *Bessemer City*, 470 U.S. at 573. Because there are no grounds for such a conclusion, the District Court's factual findings constitute the record by which appellate review is bound. Consequently, they are, in pertinent part, reproduced below.

On the night of December 19, 2003, around 11:00 p.m., a radio run alerted Officer Anthony Bowman of the Metropolitan Police Department to a report of an armed robbery in the 700 block of 9th Street, S.E., in Washington, D.C. Officer Bowman canvassed the area in his patrol car, looking for individuals matching the description of the perpetrator: a black male, approximately six-feet tall, wearing a blue sweatshirt and blue jeans. The radio report reflected that the perpetrator had been last seen moving on 9th Street, S.E., in an unknown direction.

Within two minutes of the radio report, and within approximately ten minutes of the robbery, Officer Bowman spotted defendant Paul Askew walking in the 200 block of 9th Street, S.E., five blocks from the scene of the robbery. Upon seeing Officer Bowman, the defendant turned and walked in a different direction, but Officer Bowman continued to follow the defendant in the patrol car. Defendant is a black male, six-feet, three-inches tall, and at the time was wearing clothing quite similar – but not identical – to the description broadcast over the police radio. While the description of the perpetrator mentioned a blue sweatshirt and blue jeans, Officer Bowman testified that the defendant was wearing blue sweatpants, "a navy blue jacket[, and] a darker blue fleece type jacket underneath. He had on two jackets." Officer Bowman reported to the dispatcher that Askew "vaguely match[ed] th[e] description." After noticing that the defendant had a moustache, Officer Bowman checked with the dispatcher to determine whether the robber also had a moustache. When the dispatcher responded affirmatively, Officer Bowman stopped the defendant.

Officer Bowman asked the defendant to come to the patrol car, and he complied. The defendant also complied with Officer Bowman's further requests that he produce

some identification, take his hands out of his pockets, and place his hands on the top of his head.  Officer Bowman then told the defendant that he was being stopped because of his physical similarity to the description of a robber.  When back-up units arrived, Officer Bowman returned to the interior of his car to check whether the police department computer returned any information on the defendant.  Officer Bowman's back was turned for the next couple of minutes and he did not see the pat-down of the defendant that followed.

Officer James Koenig conducted a pat-down of the defendant and found nothing.  Shortly afterwards, another officer, Officer Benton, drove the robbery victim to the place where the defendant was being detained, for the purpose of conducting a show-up.  The victim remained in the car while Officer Koenig and Officer Anthony Willis brought the defendant to a place where he could be seen by the victim.  The defendant was not in handcuffs at that time.  Preparatory to the show-up, Officer Willis attempted to unzip the defendant's outer jacket to reveal the sweatshirt underneath so the victim could better determine if the defendant was the robber.  Officer Willis testified that he remembered the "blue hooded sweatshirt" described in the radio run and "wanted the complainant to see what [the defendant] had on to make sure that he wasn't zipping nothing up to cover up.  So I went to unzip it down so that . . . they could see what he had on."  Officer Willis had difficulty, however, in unzipping the jacket when the zipper hit what he described as a "hard" or "solid" object and "didn't go past [the object].  It stopped there.  And at that time, that's when [the defendant] knocked my hand down," away from the zipper.

After the show-up, Officer Willis and Officer Edward Snead walked the defendant backwards toward the car,

placed him on the hood of the car, and unzipped his jacket. Visible once the jacket was unzipped was an open black waist pouch, or "fanny pack," with a silver object sticking out. On further inspection, the silver object was identified as a gun, and the defendant was handcuffed and arrested.

*Askew*, 313 F. Supp. 2d at 2-3 (alterations in original) (footnotes and transcript citations omitted).

In the course of its legal analysis, the District Court concluded that the disputed unzipping was undertaken to facilitate the show-up. *Id.* at 4. This conclusion is consistent with its factual findings that Officer Koenig found "nothing" during the frisk and that the complainant was brought to where appellant was detained "shortly afterwards." *Id.* at 3; *see also id.* at 4. In a footnote, the District Court notes that Officer Koenig did not testify at the suppression hearing. Rather, the testimony regarding the pat down was provided by Officer Willis. *Id*. at 3 n.2. (In fact, the motions hearing transcript reveals that the Government, as part of its trial strategy, chose not to put on Officer Koenig. *See* Mar. 26 Tr. at 21, 24, 38.) In this same footnote, the Court describes Officer Willis's "*suggest[ion]* that Officer Koenig had not completed the pat-down . . . when Officer Benton arrived with the robbery victim for a show-up." *Askew*, 313 F. Supp. 2d at 3 n.2 (emphasis added). The Court also notes Officer Willis's testimony that "*perhaps*" the pat down had not been completed "because of some resistance by the defendant." *Id*. (emphasis added). The Court then points to "[t]he government acknowledge[ment] that when Officer Koenig patted the defendant down, he did not find anything" and reiterates its own finding that "[t]he subsequent discovery of the gun at issue was not the result of this pat-down." *Id*.; *see also id.* at 4 ("[t]he initial pat-down by Officer Koenig did not reveal the presence of any weapon"). In other words, the District Court does not credit Officer Willis's *suggestion* that the pat down may have been incomplete or

Officer Willis's *speculation* regarding why that *may* have been the case.

## II. OVERVIEW

"Time and again" the Supreme Court "has observed that searches and seizures conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well delineated exceptions." *Dickerson*, 508 U.S. at 372 (quotation marks omitted) (collecting cases). And the Court has made it clear that the "inestimable right of personal security" embodied in the Fourth Amendment "belongs as much to the citizen on the streets . . . as to the homeowner closeted in his study . . . . For, as [the Supreme] Court has always recognized, 'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.'" *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968) (quoting *Union Pac. Ry. Co. v. Botsford*, 141 U.S. 250, 251 (1891)).

In *Terry v. Ohio*, the Supreme Court defined one of the few exceptions to the prohibition against warrantless searches of a person. The Court held that in the context of a properly justified on-the-street stop, if a police officer has a reasonable articulable suspicion "that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others," that officer may conduct a limited protective search "to determine whether the person is in fact carrying a weapon." 392 U.S. at 24; *see also id.* at 30-31. In *Sibron v. New York*, 392 U.S. 40 (1968), an opinion issued on the same day as *Terry*, the Court confirmed the limited nature of the *Terry* search exception, explicitly stating that the "only goal which might conceivably" justify a search in the context of a *Terry* stop is a search for weapons. *Id.* at 65.

In subsequent cases, the Court has been unequivocal in explaining that "[t]he purpose of this limited search is *not to discover evidence of crime*, but to allow the officer to pursue his investigation without fear of violence." *Adams v. Williams*, 407 U.S. 143, 146 (1972) (emphasis added). Thus, the fruit of a search that "goes beyond what is necessary to determine if [a] suspect is armed . . . will be suppressed." *Dickerson*, 508 U.S. at 373 (citing *Sibron*, 392 U.S. at 65-66). This is so, the Court explained in *Minnesota v. Dickerson*, because searches that exceed what is necessary to determine if an individual is armed "amount[] to the sort of evidentiary search that *Terry* expressly refused to authorize" and that the Court "condemned" in *Sibron v. New York*, 392 U.S. 40, and *Michigan v. Long*, 463 U.S. 1032 (1983). *Dickerson*, 508 U.S. at 378.

Appellant argues that pursuant to this well-established body of law, the unzipping of his jacket was unlawful, because it was not undertaken for protective purposes, but rather amounted to an impermissible evidentiary search unsupported by probable cause or a warrant. The Government, in contrast, asserts that this question is not controlled by *Dickerson* and the precedent on which *Dickerson* rests, but rather should be decided through application of the reasonableness balancing test. Under this test, the permissibility of a Government action is determined by "balancing the [governmental] need to search [or seize] against the invasion which the search [or seizure] entails." *Terry*, 392 U.S. at 21 (second and third alteration in original) (quotation marks omitted). Pursuant to this test, the Government argues that because the unzipping of appellant's jacket "was a reasonable, *de minimis* investigative measure that appropriately facilitated the show-up procedure," it need not have been supported by a warrant or probable cause. Gov't *En Banc* Br. at 13.

When the Supreme Court has weighed the interests relevant to determining whether a certain type of official conduct is

reasonable under the Fourth Amendment, lower courts are not free to strike a new and different balance. With respect to searches of individuals detained during on-the-street encounters on less than probable cause, the balance was struck in *Terry*, 392 U.S. 1, and *Sibron*, 392 U.S. 40. Employing the reasonableness test to which the Government refers, the Court in *Terry* authorized a strictly circumscribed search for weapons when an officer has reasonable articulable suspicion to believe that a properly stopped individual is armed and dangerous to the officers or others nearby. 392 U.S. at 30-31; *see also New York v. Class*, 475 U.S. 106, 117 (1986) ("When a search or seizure has as its immediate object a search for a weapon, . . . we have struck the balance to allow the weighty interest in the safety of police officers to justify warrantless searches based only on a reasonable suspicion of criminal activity."). The *Sibron* Court, applying *Terry*'s holding, made clear that *Terry* did not permit police officers to undertake searches not justified on a safety rationale. *See* 392 U.S. at 63-64. It also established that protective searches that extend beyond the strictly circumscribed bounds of *Terry* are impermissible evidentiary searches. *Id.* at 65-66. Most important, for our purposes, the Court's opinion in *Minnesota v. Dickerson*, 508 U.S. 366, confirms that when an on-the-street search of an individual who has been stopped on reasonable articulable suspicion extends beyond what is authorized in *Terry*, there is no reweighing to be undertaken on the grounds that the search might be described as minimally intrusive or that the evidence sought might provide probable cause to believe that the suspect committed the crime in question.

Because there is no principled way to distinguish the initial unzipping in this case from the search in *Dickerson*, this court is not free to reweigh the interests at issue to create the new and wholly unprecedented identification exception to the warrant and probable cause requirements that the Government urges upon us. Rather, applying the balance that the Supreme Court

struck in *Terry* and *Sibron* to the uncontested factual findings of the District Court, we are convinced that the unzipping of appellant's jacket was a non-protective evidentiary search that violated the Fourth Amendment.

### III. ANALYSIS OF THE LEGAL ISSUES

### A. *The Partial Unzipping and Opening of Appellant's Jacket Was a Search*

Before turning to the issues before the *en banc* court, we must determine whether the unzipping of appellant's jacket was, in fact, a search. Clearly it was. By zipping up his jacket, appellant unquestionably evidenced an intent to keep private whatever lay under it. The only question, then, is whether society is prepared to recognize such an expectation as reasonable. *See Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring).

This question was unequivocally answered by the Supreme Court in *Terry*. At issue there was the touching of the outer surface of the defendant's overcoat. *Terry*, 392 U.S. at 7. As the Court explained, even that limited action rose to the level of a "search" within the purview of the Fourth Amendment. *Id.* at 16. Because the opening of a fastened coat, like the opening of most other clothing, renders visible whatever lies underneath, such an action involves an even greater intrusion in precisely the same socially recognized expectation of privacy. And such an intrusion is particularly great when, as here, the opening takes place on a public street. In describing the level of personal intrusion occasioned by a public frisk, the *Terry* Court stated:

> [I]t is simply fantastic to urge that such a procedure performed in public by a policeman while the citizen stands helpless, perhaps facing a wall with his hands raised, is a "petty indignity." It is a serious intrusion upon the sanctity of the person, which may inflict great indignity and arouse strong resentment.

*Id.* at 16-17. The undoing of clothing to reveal whatever is underneath to whomever happens to be on the street necessarily involves an even more serious intrusion upon the sanctity of the person. The involuntary opening of someone's clothing reveals to the world at large (not just to the searching police officer) what an individual obviously intends to keep private.

As noted above, the Government did not dispute the characterization of the unzipping as a search during arguments before the panel. Before the *en banc* court, however, the Government refused to concede the point. Stating that it was only "assum[ing], *arguendo*, that the unzipping of appellant's jacket was a 'search,'" Gov't *En Banc* Br. at 23 n.11, the Government maintained that the police action did not actually amount to a search because the sweatshirt that the police expected to reveal "presumably was widely visible when appellant was in indoor settings." *Id.* This argument is flawed in both its legal and factual premises.

Relying primarily on *United States v. Dionisio*, 410 U.S. 1 (1973), the Government likens appellant's sweatshirt to a "physical characteristic . . . constantly exposed to the public." Gov't *En Banc* Br. at 23 n.11 (omissions in original). This analogy is inapt. In *Dionisio*, the Supreme Court held that production of a voice exemplar pursuant to a grand jury subpoena did not constitute a search, because "[t]he physical characteristics of a person's voice, its tone and manner, as opposed to the content of a specific conversation, are constantly exposed to the public. Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear." 410 U.S. at 14. As the Court explained, "while the content of a communication is entitled to Fourth Amendment protection . . . the underlying identifying characteristics – the constant factor throughout both public and private communications – are open for all to see or hear." *Id.* (quotation marks omitted) (omission in original). Consequently, "[n]o

person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world." *Id.*

The same cannot be said of a piece of clothing when the only information that the police have about that clothing is that the wearer has chosen to shield most of it from public view. Contrary to the Government's assertion, there is nothing about a sweatshirt that – like the characteristics of an individual's voice, handwriting, or face – must necessarily be revealed to the public in the course of daily life. An individual may choose to expose all or part of an article of clothing to the public or he may choose to keep all or part of that clothing covered.

The only evidence presented by the Government regarding appellant's sweatshirt was that appellant had demonstrated an intent to shield most of it from public view. When a government agent unfastens, lifts, pulls down, pats, or otherwise manipulates clothing to reveal or determine what lies underneath, that manipulation necessarily involves the sort of "'probing into an individual's private life'" that the Court in *Davis v. Mississippi*, 394 U.S. 721 (1969), characterized as the mark of a search or interrogation. *Dionisio*, 410 U.S. at 15 (quoting *Davis v. Mississippi*). Citing *Terry*, the *Dionisio* Court reiterated that even the minimal intrusion involved in a *Terry* frisk of outer clothing necessarily amounts to a Fourth Amendment search. Contrasting the seizure of voice exemplars to permissible *Terry* pat downs, the Court explained that the former "does not involve the severe, though brief, intrusion upon cherished personal security, effected by" the latter. *Dionisio*, 410 U.S. at 15 (quotation marks omitted).

The Government's argument that the unzipping of appellant's jacket was not a search is also based on fundamentally flawed factual premises. First, the Government assumes that the unzipping of appellant's jacket would reveal *only* appellant's already partially visible sweatshirt. One need

only consider the special medical needs of certain individuals, including those who are forced to use colostomy bags and heart monitors (to name a few) to recognize the fallacy of this assumption. Such devices frequently are attached to an individual's abdominal area and often require those wearing them to hike up the clothing around their midsection to accommodate the device. Second, many individuals wear clothing that is comfortable to them but would appear unseemly to others. In such circumstances, the individual who does not want the unseemly portions of his clothing publicly exposed will cover or partially cover that clothing with another garment. Appellant's fastening of his jacket effectively expressed a recognized and reasonable expectation of privacy. And its unfastening cannot be characterized as a non-search given the inability of the police to know what other information pertaining to appellant's private life that unfastening would reveal.

**B.** **Minnesota v. Dickerson** *Dictates the Conclusion That the Unzipping of Appellant's Jacket Was an Impermissible Search for Evidence*

The legal principles controlling the disposition of this case were largely established in three post-*Terry* Supreme Court cases, all of which were relied on by the Court in *Minnesota v. Dickerson*. Those cases are *Sibron*, 392 U.S. 40; *Ybarra v. Illinois*, 444 U.S. 85 (1979); and *Long*, 463 U.S. 1032. Discussing and applying *Terry*, each makes clear that in the context of an on-the-street seizure based on less than probable cause, there is no balancing of interests to be undertaken in determining whether a particular search of a stopped suspect is reasonable and therefore permissible under the Fourth Amendment. Rather, applying the balance struck in *Terry*, courts are constrained to suppress evidence obtained during such a stop if it is the fruit of a search that was not necessary to protect the investigating officers or others nearby. Put another way, these decisions establish that individuals stopped on no

more than reasonable articulable suspicion may not, consonant with the protections of the Fourth Amendment, be searched for the purpose of revealing and gathering evidence pertaining to the illegal behavior of which they are suspected.

*Sibron*, a companion case to *Terry*, clarified the limits of the search exception authorized in *Terry*, holding that a non-protective evidentiary search of an individual detained on less than probable cause, would not pass Fourth Amendment muster. In that case, a police officer stopped Sibron on suspicion that he was selling narcotics. *See* 392 U.S. at 45. When the officer said to Sibron, "You know what I am after," Sibron "mumbled something and reached into his pocket. Simultaneously, [the officer] thrust his hand into the same pocket" discovering several envelopes of heroin. *Id.* (quotation marks omitted). After first concluding that the officer lacked probable cause to arrest Sibron when he stopped him, *id.* at 62-63, the Court held that the search of Sibron's pocket for evidence of narcotics was unconstitutional. Relying on its decision in *Terry*, the Court concluded that the officer's action was not predicated on any concern that Sibron was armed, but rather constituted a search for evidence of the crime that the officer suspected Sibron of committing. *See id.* at 63-64. As the Court described it, the officer's "opening statement to Sibron . . . made it abundantly clear that he sought narcotics, and his testimony at the hearing left no doubt that he thought there were narcotics in Sibron's pocket." *Id.* at 64. Moreover, as the Court explained, even if the search had been predicated on a reasonable articulable suspicion that Sibron was armed, the search would have been impermissible because it "was not reasonably limited in scope to the accomplishment of the *only* goal which might conceivably have justified its inception – the protection of the officer by disarming a potentially dangerous man." *Id.* at 65 (emphasis added).

In *Ybarra,* the Court reiterated the limits of its *Terry* search rationale. The search at issue there took place in the Aurora Tap Tavern. 444 U.S. at 88. The police had obtained a warrant authorizing the search of the tavern and an individual named Greg. *Id.* Upon entering the tavern, the officers frisked each of its patrons for weapons. *Id.* During the frisk of Ybarra, an "officer felt what he described as a cigarette pack with objects in it." *Id.* at 88 (quotation marks omitted). After completing the pat down of a number of other patrons, the officer returned to Ybarra, frisked him again, and removed from his shirt pocket a cigarette pack containing what turned out to be packets of heroin. *Id.* at 89. The State argued, *inter alia*, that the first pat down of Ybarra was a permissible frisk for weapons under *Terry.* *Id.* at 92. The Court rejected the State's argument, concluding that because "[t]he initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous," *id.* at 92-93, the evidence must be suppressed. As the Court explained, "[t]he *Terry* case created an exception to the requirement of probable cause, an exception whose narrow scope this Court has been careful to maintain. Under that doctrine a law enforcement officer, *for his own protection and safety*, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted." *Id.* at 93 (emphasis added) (quotation marks omitted). However, the Court was careful to point out that "[n]othing in *Terry* can be understood to allow a generalized 'cursory search for weapons' or, indeed, *any search whatever for anything but weapons*." *Id.* at 93-94 (emphasis added).

In *Long*, which extended *Terry*'s protective search doctrine to the interior of cars, the Court confirmed and explained its unwillingness to allow non-protective evidentiary searches based on less than probable cause during run-of-the-mill investigatory stops. The Court there addressed the constitutionality of the search of the interior compartment of an

automobile during a lawful investigatory stop of its occupant. 463 U.S. at 1037. Quoting *Terry*, the Court concluded "that the search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *Id.* at 1049. The Court "stress[ed]," however, that its decision did "not mean that the police may conduct automobile searches *whenever* they conduct an investigative stop." *Id.* at n.14 (emphasis in original). As the Court explained, this is because the justification for allowing automatic warrantless searches for evidence incident to an arrest does not support an automatic warrantless evidentiary search during a *Terry* stop. *See id.*

> An additional interest exists in the arrest context, *i.e.*, preservation of evidence, and this justifies an "automatic" search. However, that additional interest does not exist in the *Terry* context. A *Terry* search, "unlike a search without a warrant incident to a lawful arrest, is not justified by any need to prevent the disappearance or destruction of evidence of crime . . . . The sole justification of the search . . . is the protection of police officers and others nearby."

*Id.* (quoting *Terry*, 392 U.S. at 21) (alterations in original).

Relying on the rationale of these cases, the Court in *Minnesota v. Dickerson* again confirmed that non-protective evidentiary searches are not permissible during *Terry* stops. There, on facts essentially indistinguishable from those presented here, the Supreme Court held that a police officer violated the Fourth Amendment proscription against unreasonable searches when, following a protective frisk that produced no evidence of a weapon, he manipulated the outside of a suspect's jacket pocket in an effort to identify as crack

cocaine a small lump detected during the frisk. 508 U.S. at 378-79. Dickerson first came to the attention of the searching officer and his partner when he left what was a well-known crack house. *Id.* at 368. "According to testimony credited by the trial court, [Dickerson] began walking toward the police but, upon spotting the squad car and making eye contact with one of the officers, abruptly halted and began walking in the opposite direction." *Id.* at 368-69. Based on these "evasive actions and the fact that he had just left a building known for cocaine traffic, the officers decided to . . . investigate further." *Id*. at 369. They stopped Dickerson and patted him down for weapons. *Id*. Although the pat down revealed no weapons, "the officer conducting the search did take an interest in a small lump in respondent's nylon jacket." *Id*. The officer, who did not immediately recognize the lump as crack cocaine, determined what it was only after "squeezing, sliding and otherwise manipulating the contents of the defendant's pocket." *Id*. at 378 (quotation marks omitted).

The Supreme Court granted *certiorari* in *Dickerson* "to resolve a conflict among the state and federal courts over whether contraband detected through the sense of touch during a patdown search may be admitted into evidence." *Id*. at 371. In essence, the issue before the Court was whether and when the plain view doctrine of *Arizona v. Hicks*, 480 U.S. 321 (1987), could justify a plain feel exception for nonthreatening evidence detected during a *Terry* pat down.

Citing and discussing *Sibron*, *Ybarra*, and *Long*, the Court first reviewed the limits on searches conducted during *Terry* stops, *Dickerson*, 508 U.S. at 372-73, concluding with the long "settled" principle that if a "protective search goes beyond what is necessary to determine if the suspect is armed, it is no longer valid under *Terry* and its fruits will be suppressed," *id*. at 373. Turning to the plain view doctrine, the Court explained that "if police are lawfully in a position from which they view an object,

if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *Id*. at 375. However, the Court continued, if "the police lack probable cause to believe that an object in plain view is contraband without conducting some further search of the object – *i.e.*, if 'its incriminating character [is not] immediately apparent,' the plain-view doctrine cannot justify its seizure." *Id*. (alteration in original) (citations omitted).

Applying these principles to nonthreatening contraband discovered during *Terry* pat downs, the Court concluded that a warrantless seizure would be permissible "so long as the officers' search *stays within the bounds marked by Terry*," *id*. at 373 (emphasis added), and the object's "contour or mass makes its identity *immediately* apparent," *id.* at 375 (emphasis added).

In addressing the facts before it, the *Dickerson* Court described the "dispositive question" as "whether the officer who conducted the search was acting within the lawful bounds marked by *Terry* at the time he gained probable cause to believe that the lump in respondent's jacket was contraband." *Id*. at 377. Answering that question in the negative, the Court concluded that the "officer's continued exploration of respondent's pocket after having concluded that it contained no weapon was unrelated to '[t]he sole justification of the search [under *Terry*:] . . . the protection of the police officer and others nearby.'" *Id*. at 378 (quoting *Terry*, 392 U.S. at 29) (alterations in original). Thus, the Court found that the manipulation of appellant's pocket "amounted to the sort of evidentiary search that *Terry* expressly refused to authorize, *see* [392 U.S.] at 26, and that we have condemned in" *Sibron*, 392 U.S. at 65-66, and *Long*, 463 U.S. at 1049 n.14. *Dickerson*, 508 U.S. at 378.

"Once again," the Court explained, "analogy to the plain-view doctrine is apt." *Id.*

> In *Arizona v. Hicks*, 480 U.S. 321 (1987), this Court held invalid the seizure of stolen stereo equipment found by police while executing a valid search for other evidence. Although the police were lawfully on the premises, they obtained probable cause to believe that the stereo equipment was contraband only after moving the equipment to permit officers to read its serial numbers. The subsequent seizure of the equipment could not be justified by the plain-view doctrine, this Court explained, because the incriminating character of the stereo equipment was not immediately apparent; rather, probable cause to believe that the equipment was stolen arose only as a result of a further search – the moving of the equipment – that was not authorized by a search warrant or by any exception to the warrant requirement.

*Dickerson*, 508 U.S. at 378-79. Concluding that the search of Dickerson was "very similar" to the search of the stereo equipment, *id.* at 379, the Court held that the disputed search of Dickerson's pocket was unconstitutional.

> Although the officer was lawfully in a position to feel the lump in respondent's pocket, because *Terry* entitled him to place his hands upon respondent's jacket, the court below determined that the incriminating character of the object was not immediately apparent to him. Rather, the officer determined that the item was contraband only after conducting a further search, one not authorized by *Terry* or by any other exception to the warrant requirement. Because this further search of respondent's pocket was constitutionally invalid, the seizure of the cocaine that followed is likewise unconstitutional.

*Id*.

The disputed search of appellant in this case cannot be distinguished in any meaningful way from the impermissible

search in *Dickerson*. Here, as in *Dickerson*, neither the constitutionality of the initial stop nor the protective frisk was at issue. In addition, neither the frisk of Dickerson nor the frisk of appellant produced any evidence of a weapon. Nevertheless, in each case, the police undertook a further search aimed at determining whether certain physical evidence would identify the stopped individual as the perpetrator of the crime in question. In *Dickerson*, the police officer manipulated the outside of the suspect's jacket pocket to determine whether the small lump in that pocket felt like crack cocaine. Here, the police manipulated appellant's jacket, partially unzipping and opening it, so that the complainant could see the sweatshirt underneath appellant's jacket. In each case, the goal of the officer was to obtain information about a physical object in the suspect's possession that the officer believed might identify the suspect as having committed the crime in question. In other words, the officer's goal in each case was to determine whether the object of the search, the lump in *Dickerson* and the sweatshirt here, had particular incriminating characteristics that would contribute to a probable cause determination. And in each case, the officer sought to accomplish this goal pursuant to a search that exceeded the bounds of *Terry*.

The Government's attempt to distinguish *Dickerson* is entirely unavailing. The sum and total of the Government's argument consists of a single sentence:

> This case is critically different from *Dickerson*, because this case does not involve an intrusive search of the person for evidence, but rather involves the very minimal intrusion of partially unzipping a coat to reveal a sweatshirt, not as part of a general search for evidence, but rather as a reasonable incident of an entirely permissible show-up identification procedure.

Gov't *En Banc* Br. at 38-39. This bald assertion is unsupported by any further explanation and is quite wrong in what it suggests.

The assertion that the impermissible search of Dickerson was more intrusive than the search of appellant is specious. If anything, the search of appellant was more intrusive. First, as the Supreme Court pointed out, when the officer in *Dickerson* undertook the impermissible search, he was at least "lawfully in a position to feel the lump in [Dickerson's] pocket," having just finished a pat down. 508 U.S. at 379. Moreover, throughout the search in *Dickerson*, the officer never strayed from the outside surface of the suspect's jacket pocket. He did not open the pocket. He did not look into it. And he did not reach inside the jacket to feel the pocket's contents. Thus, while the officer in *Dickerson* felt the lump through the jacket pocket, he did not physically penetrate the outer surface of the jacket. Rather, he simply "squeez[ed], slid[], and otherwise manipulat[ed] the contents of the defendant's pocket." *Id.* at 378 (quotation marks omitted). And, significantly, his actions did not reveal the contents of the pocket to the public at large.

Here, when Officer Willis unzipped to the waist appellant's fastened jacket so that the complainant could see what was underneath, he not only penetrated the outer layer of appellant's clothing, he actually physically peeled a portion of it back. In contrast to the officer in *Dickerson*, Officer Willis also exposed what lay under that outer layer to the public at large. Consequently, in addition to exposing the sweatshirt to the complainant, the search of appellant's jacket necessarily exposed whatever else appellant had under that portion of his jacket to whomever was present on or looking at the street when his jacket was unzipped. The search here thus involved a greater invasion of the person than the manipulation of the outer surface of Dickerson's jacket pocket.

The Government's second distinction, that the search of Dickerson was a "general search for evidence," while the unzipping of appellant's jacket was "a reasonable incident of an entirely permissible show-up identification procedure," Gov't *En Banc* Br. at 39, is, at best, puzzling. When pressed at oral argument regarding this alleged distinction between what the police were searching for in *Dickerson* and what they were searching for here, Government counsel asserted that the search of appellant was different from the search of Dickerson, because the search of Dickerson was a "full-blown evidentiary search," Tr. of *En Banc* Argument (Oct. 11, 2007) at 44, "a pure evidentiary search for contraband," *id*. at 43. In contrast, according to counsel, the officers here "weren't trying to recover physical evidence." *Id*. at 43; *see also id*. at 45.

The Government's argument is unpersuasive. Certainly if the complainant had identified the appellant as her assailant on the basis of his sweatshirt, that sweatshirt would have been seized as physical evidence of appellant's guilt. Moreover, it is clear that the search here was intended to reveal evidence – both physical evidence (the sweatshirt) and testimonial evidence (the complaint's identification of it) – that would either support the probable cause necessary to arrest appellant or dispel the officer's reasonable suspicion that appellant was the robber. It is simply impossible for us to ascertain how that differs from the *Dickerson* officer's attempt to uncover tactile evidence regarding the lump in the suspect's pocket that would support the probable cause necessary to effectuate an arrest or dispel the officer's suspicion that Dickerson was committing a narcotics offense.

**C.** ***The Government's Arguments for an Investigative Identification Search Exception Are Not Supported by Precedent***

There is no Supreme Court or federal appellate case law supporting the search of an individual stopped only on

reasonable articulable suspicion after a pat down of that individual has produced no evidence of a weapon. At oral argument, Government counsel conceded that there is no such precedent. Tr. of *En Banc* Argument at 51-52.

Absent such precedent, the Government attempts a three-part argument in support of a wholly new investigative identification search exception to the warrant and probable cause requirements. First, it points to cases in which the Supreme Court has used the balancing test to assess the Fourth Amendment permissibility of what the Government characterizes as "a wide array" of warrantless "governmental intrusions based on something less than probable cause." Gov't *En Banc* Br. at 19-21. Second, it seeks support in several Supreme Court cases indicating that "police officers may take reasonable steps necessary to facilitate a brief investigation during a *Terry* stop." *Id.* at 21-22. Third, it asserts that the Supreme Court has approved investigative measures, similar to the unzipping of appellant's jacket, that are related to identification issues. *Id.* at 24-28. None of the cited cases, either singularly or in combination, support the permissibility of the non-protective evidentiary search at issue here.

1. The "Balancing-Test" Cases Do Not Support an Investigative Identification Search Exception

Unsurprisingly, given the Court's pronouncements in *Dickerson* and *Sibron*, none of the balancing-test cases cited by the Government involve the permissibility of a search during a run-of-the-mill *Terry* stop. Rather, the cited cases fall into one of three categories, each of which is irrelevant to the issue here.

In one category, the Court relies on the balancing test to extend *Terry*'s safety rationale to new and limited settings. *See, e.g.*, *Maryland v. Buie*, 494 U.S. 325, 327 (1990) (a "protective sweep . . . incident to an arrest" does not violate the Fourth Amendment "if the searching officer possesse[s] a reasonable

belief . . . that the area swept harbor[s] an individual posing a danger to the officer or others"); *Pennsylvania v. Mimms*, 434 U.S. 106, 110-11 (1977) ("inordinate risk confronting an officer" justifies requiring a driver who is stopped for traffic violation to step out of the car).

In the second category, the Court uses the balancing test to assess the permissibility of searches of individuals who have a lessened expectation of privacy as a result of governmental supervision to which they were legitimately subject at the time of the search. *See, e.g.*, *United States v. Knights*, 534 U.S. 112, 119-22 (2001) (defendant's "status as a probationer subject to a search condition" results in a diminished expectation of privacy that does not outweigh governmental interest in crime prevention and rehabilitation); *O'Connor v. Ortega*, 480 U.S. 709, 725-26 (1987) ("Balanced against the substantial government interests" of public employers, "the privacy interests of government employees in their place of work . . . are far less than those found at home or in some other contexts."); *New Jersey v. T.L.O.*, 469 U.S. 325, 341 (1985) ("[T]he accommodation of the privacy interests of school children with the substantial need of teachers and administrators for freedom to maintain order in the schools does not require strict adherence to the requirement that searches be based on probable cause to believe that the subject of the search has violated or is violating the law. Rather, the legality of a search of a student [in a public school] should depend simply on the reasonableness, under all the circumstances, of the search.").

The remainder of the cases relied on by the Government to support its assertion that the reasonableness balancing test provides the means by which we should assess the unzipping of appellant's jacket are inapt in that they do not involve searches. Rather, these cases simply stand for the proposition that, in certain situations, a seizure – if limited enough in scope – may be found reasonable though based on something other than

probable cause to believe that criminal activity is afoot. *See, e.g.*, *Illinois v. Lidster*, 540 U.S. 419 (2004) (highway checkpoint to locate a hit and run driver found reasonable because contact with police – which consisted of a request for information and the distribution of a flyer – lasted no more than a few seconds and did not involve a search for evidence); *United States v. Place*, 462 U.S. 696 (1983) (seizure of luggage based on reasonable articulable suspicion that it contains narcotics may be permissible if detention is limited in duration and investigative measures used to confirm or dispel suspicion do not include a search of contents); *United States v. Martinez-Fuerte,* 428 U.S. 543 (1976) (highway checkpoints at border requiring vehicle occupants to respond to brief questions and possibly produce documents evidencing a right to be in the United States found reasonable where neither the vehicle nor its occupants were searched).

Clearly none of these cases support the Government's argument that the unzipping of appellant's jacket was "a reasonable, *de minimis* investigative measure that appropriately facilitated the show-up procedure." Gov't *En Banc* Br. at 13. The first set of cases merely allows for limited intrusions carefully tailored to reveal or eliminate an officer's reasonable articulable suspicion that a person or place poses a danger to himself or others nearby. The inapplicability of the second set of cases is easily demonstrated by considering how any one of the defendants in those cases would have been treated had they not legitimately been subject to increased governmental supervision. For example, had the fourteen-year-old public school student in *T.L.O.* left school property, it is clear that no police officer could have permissibly searched her purse merely because she had been seen smoking in the school lavatory. The third set of cases is similarly wholly irrelevant to the issue before us in that none of the cases involve a search of any kind.

2. Cases Indicating that Police Officers May Take Certain Steps to Facilitate a Brief Investigation During a *Terry* Stop Do Not Support an Identification Search Exception

None of the cases on which the Government relies to support its second premise – that police officers may take reasonable steps necessary to facilitate a brief investigation during a *Terry* stop – lend support to its ultimate conclusion that the unzipping here was a permissible investigative step. This is because none of the permissible investigatory measures in the cases cited by the Government involved an evidentiary search. As described in *Michigan v. Summers*, 452 U.S. 692 (1981), permissible investigative measures in the context of a *Terry* stop consist of questioning (which may include a request for identification or inquiry concerning the suspicious conduct of the person detained); communication with police or private citizens to verify explanations, confirm identification, or determine whether a person of the proffered identity is otherwise wanted; a short detention while police check premises and talk to others to determine whether, in fact, an offense has occurred; the examination of objects abandoned by the suspect; and, if it is known that an offense was committed in the area, the viewing of the suspect by witnesses to the crime. *Id*. at 700 n.12.

The only additional investigative steps referenced by the Government are those related to the seizure of a traveler's baggage permitted when an officer has reasonable articulable suspicion to believe that it contains narcotics. *See* Gov't *En Banc* Br. at 22 (citing *Place*, 462 U.S. at 703-04). In *Place*, though, the Court was careful to point out that if the investigative procedure for which luggage is seized is "itself a search requiring probable cause, the initial seizure of [the] luggage . . . – no matter how brief – [can]not be justified on less than probable cause." 462 U.S. at 706. The Court went on to explain that the dog sniff test for narcotics, to which Place's

luggage was subject, *was not a search*, because it neither required that the luggage be opened, nor exposed non-contraband items that otherwise would have remained shielded from public view. *Id*. at 707. Because the unzipping here was a search, *Place* supports the conclusion that the unzipping of appellant's jacket was not a permissible investigative measure.

    3.    The Investigative Measures Cases Pertaining to Identification Issues Provide No Support for the Government's Identification Search Exception

The Government principally relies on four cases in support of its argument that searches narrowly tailored to facilitate a show-up procedure are permissible investigative measures. One of those cases, *New York v. Class*, 475 U.S. 106 (1986), is not only distinguishable, but actually supports the opposite of what the Government claims. Two others, *United States v. Dionisio*, 410 U.S. 1 (1973), and *United States v. Mara*, 410 U.S. 19 (1973), lend no support whatsoever to the Government's argument, because they involved neither a search nor an investigative step taken in the context of a *Terry* stop. That leaves the *dicta* in *Hayes v. Florida*, 470 U.S. 811, 816-17 (1985). And the language in *Hayes* to which the Government points simply cannot take the Government where it needs to go to prevail on the facts presented here.

    a.   *Class* Supports the Exclusion of the Gun Evidence

In *Class*, the Supreme Court determined that a police officer conducted a search when, during a traffic stop, he reached into the defendant's vehicle to move some papers that obscured the vehicle identification number (VIN) on the dashboard. 475 U.S. at 114-15. In so doing, the officer saw a gun under the driver's seat. *Id.* at 108. As described by the Government in its *en banc* brief, "[t]he Supreme Court concluded that the officer's actions were reasonable, after applying a 'balancing' test that considered, among other things, that 'the search was focused on

its objective [of revealing the VIN] and no more intrusive than necessary to fulfill that objective;' and that the search was 'far less intrusive than a formal arrest.'" Gov't *En Banc* Br. at 27-28 (quoting *Class*, 475 U.S. at 118) (alterations in original). "Thus," according to the Government, *Class* approved a limited investigative search "similar" to the unzipping of appellant's jacket, "without requiring probable cause." Gov't *En Banc* Br. at 28. The Government's characterization badly distorts the Court's reasoning and is simply wrong in its conclusion.

The *Class* opinion, in fact, rests on three factors – the impossibility of having a reasonable expectation of privacy in a VIN, officer safety, and the existence of probable cause – that not only render the balance struck there inapplicable to the case here, but actually support the conclusion that the unzipping of appellant's jacket was impermissible. Because there is no expectation of privacy in VINs, the intrusion at issue in *Class* was not the moving of the papers covering the VIN, but rather the officer's *reach into the car* to move those papers. *See Class*, 475 U.S. at 114-15. The inquiry was made necessary by the fact that the officer had prevented the respondent, who had alighted from his car when the police pulled him over, from getting back into the car to move the papers. *See id.* at 115. Noting that under *Pennsylvania v. Mimms*, 434 U.S. 106, safety concerns permitted the officer to detain the driver outside of the car, the Court explained that the question at issue was whether the officer additionally could "effect a search for the VIN that may have been necessary only because of that detention." *Class*, 475 U.S. at 116.

The Court concluded that the search was permissible. It said: "In light of the danger to the officers' safety that would have been presented by returning respondent immediately to his car, we think the search to obtain the VIN was not prohibited by the Fourth Amendment." *Id.* However, in describing the balancing by which it reached this conclusion, the Court made

clear that because the safety concern at issue arose not from a particularized belief that the respondent had a weapon, but rather from the more generalized concern for officer safety that motivated the Court in *Mimms*, *id*. at 115-16, the Government was required to demonstrate some probable cause focusing suspicion on the individual affected by the search. *Id.* at 117-18. The Court explained:

> When a search or seizure has as its immediate object a search for a weapon, . . . we have struck the balance to allow the weighty interest in the safety of police officers to justify warrantless searches based only on a reasonable suspicion of criminal activity. *See Terry v. Ohio*, [392 U.S. at 21]; *Adams v. Williams*, 407 U.S. 143 (1972). Such searches are permissible despite their substantial intrusiveness. *See Terry v. Ohio*, [392 U.S. at] 24-25 (search was "a severe, though brief, intrusion upon cherished personal security, and . . . must surely [have] b[een] an annoying, frightening, and perhaps humiliating experience").
>
> When the officer's safety is less directly served by the detention, something more than objectively justifiable suspicion is necessary to justify the intrusion if the balance is to tip in favor of the legality of the governmental intrusion. In *Pennsylvania v. Mimms*, [434 U.S.] at 107, the officers had personally observed the seized individual in the commission of a traffic offense before requesting that he exit his vehicle. In *Michigan v. Summers*, 452 U.S. 692, 693 (1981), the officers had obtained a warrant to search the house that the person seized was leaving when they came upon him.

*Id.* at 117 (parenthetical alterations in original).

Although the *Class* Court acknowledged the difference between the facts before it and the facts in *Mimms* and *Summers*,

it concluded that the balance struck in those cases supported the permissibility of the officer's intrusion into the car in the case before it. *Id.* at 117-18. As the Court explained: "All three of the factors involved in *Mimms* and *Summers* are present in this case: [1] the safety of the officers was served by the governmental intrusion; [2] the intrusion was minimal; and [3] the *search stemmed from some probable cause focusing suspicion on the individual affected by the search*. Indeed, here the officers' probable cause stemmed from directly observing respondent commit a violation of the law," which, the Court noted, would have justified his arrest. *Id*. at 118 (emphasis added).

The *Class* Court thus held that the officer's search for the VIN number "was sufficiently unintrusive to be constitutionally permissible *in light of* the lack of a reasonable expectation of privacy in the VIN *and* the fact that the officers observed respondent commit two traffic violations. Any other conclusion," the Court found, "would expose police officers to potentially grave risks without significantly reducing the intrusiveness of the ultimate conduct – viewing the VIN – which . . . the officers were entitled to do as part of an undoubtedly justified traffic stop." *Id.* at 119 (emphasis added).

Here, in contrast, there was no officer safety interest served by the unzipping. The officers did not have probable cause focusing suspicion on appellant, but rather only a reasonable suspicion of criminal activity, which the *Class* opinion makes clear cannot justify a search that does not have a weapon as its "immediate object." *See id.* at 117. And, perhaps most important, appellant clearly had a reasonable expectation of privacy in what lay underneath his jacket. The objective of the search was not, in other words, to reveal an object in which no one can have a reasonable expectation of privacy.

b. *Dionisio* and *Mara*, Which Involved Grand Jury Subpoenas for Evidence in Which There Was No Reasonable Expectation of Privacy, Are Inapposite

*Dionisio* and *Mara* also lend no support to the Government's claim, because neither case involved a search or a police action during an on-the-street *Terry* stop. Rather, both decisions addressed the permissibility of grand jury subpoenas seeking evidence in which there can be no expectation of privacy. In *Dionisio*, 410 U.S. 1, the Court considered the permissibility of a subpoena requiring an individual to produce a voice exemplar for comparison to certain incriminating tapes. In *Mara*, 410 U.S. 19, it examined the permissibility of a subpoena to compel production of a potentially incriminating handwriting exemplar. In *Dionisio*, the Court first concluded that a grand jury subpoena, unlike a *Terry* detention, is not a Fourth Amendment seizure. 410 U.S. at 9. The Court held that this was so, at least in part, because grand jury subpoenas are subject to judicial supervision and do not involve the same type of often forceful and demeaning compulsion as investigative stops and arrests. *Id*. at 9-10. The Court then explained that production of a voice exemplar is not a search, since no individual can have a reasonable expectation of privacy in the physical characteristics of his tone of voice. *Id*. at 14. "Like a man's facial characteristics, or handwriting, his voice is repeatedly produced for others to hear. No person can have a reasonable expectation that others will not know the sound of his voice, any more than he can reasonably expect that his face will be a mystery to the world." *Id*.; *see also Mara*, 410 U.S. at 21 ("Handwriting, like speech, is repeatedly shown to the public, and there is no more expectation of privacy in the physical characteristics of a person's script than there is in the tone of his voice.").

The same cannot be said of a piece of clothing when the only information that the police have about that clothing is that the wearer has chosen to shield most of it from public view. A sweatshirt, unlike an individual's tone of voice, handwriting, or facial characteristics, is not invariably revealed to the public in the course of a person's daily life.

### c. The *Hayes v. Florida Dicta* Does Not Extend to Investigative Measures Involving Searches

The *dicta* in *Hayes v. Florida* provides no support for the unzipping of appellant's jacket. In *Hayes*, the Court held that the police may not transport a suspect to the police station for fingerprinting without probable cause. The *dicta* to which the Government points merely suggests that "a brief detention in the field for the purpose of fingerprinting" may be permissible "where there is only reasonable suspicion not amounting to probable cause." 470 U.S. at 816. The Court made it clear, however, that such an investigative action might be permissible only so long as (1) "there is reasonable suspicion that the [stopped] suspect has committed a criminal act" (in other words, so long as there is reasonable articulable suspicion justifying the stop of the suspect), (2) "there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime," and (3) "the procedure is carried out with dispatch." *Id.* at 817. In support of these criteria, the Court cited to *United States v. Place*, 462 U.S. 696 (1983).

In *Place*, the Court determined that the seizure of a traveler's luggage on less than probable cause may be reasonable so long as the "observations [of the seizing officer] lead him reasonably to believe that . . . [the] luggage . . . contains narcotics," 462 U.S. at 706, and the detention is brief, *id.* at 707-10. Most important, for purposes of the issue before this court, the *Place* opinion made it clear that when a seizure is based on less than probable cause, the accompanying

investigative methods may not include a search. As the Court explained:

> Obviously, if [the] investigative procedure [at issue here – a dog sniff –] is itself a search requiring probable cause, the initial seizure [of the luggage] for the purpose of subjecting it to the sniff test – no matter how brief – could not be justified on less than probable cause.

*Id.* at 706. The Court went on to find that dog sniff tests are not searches because they (1) do not require the opening of luggage and thus do not expose to public view non-contraband items that would otherwise remain hidden and (2) do not reveal to authorities any information about the contents of a piece of luggage beyond the presence or absence of illegal narcotics. *Id.* at 707. "In these respects," the Court concluded, "the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure." *Id.*

In *Cupp v. Murphy*, 412 U.S. 291 (1973), the Supreme Court had earlier indicated that fingerprinting is another investigative measure that, like a dog sniff, is not a search requiring probable cause. The Court there distinguished fingerprinting from the taking of fingernail scrapings:

> Unlike the fingerprinting in *Davis*, the voice exemplar obtained in *United States v. Dionisio*, [410 U.S. 1], or the handwriting exemplar obtained in *United States v. Mara*, 410 U.S. 19, 93, the search of the respondent's fingernails went beyond mere "physical characteristics . . . constantly exposed to the public."

*Id.* at 295 (quoting *United States v. Dionisio*, 410 U.S. at 14) (alterations in original). *Cupp* thus relied on the Court's suggestion in *Davis v. Mississippi* that fingerprinting is not a search, because it "involves none of the probing into an

individual's private life and thoughts that marks an interrogation or search." *Davis*, 394 U.S. at 727. Describing the holding in *Davis*, the *Hayes* Court used virtually the same language. *See* 470 U.S. at 814 ("fingerprinting, because it involves neither repeated harassment nor any of the probing into private life and thoughts that often marks interrogation and search, represents a much less serious intrusion upon personal security than other types of searches and detentions").

Clearly, because the investigative method employed in this case – the unzipping of appellant's jacket – did constitute a search, it cannot be permissible under the criteria set forth in *Hayes*, *Place*, and *Cupp*.

**D.** ***Even if the* Hayes *Dicta Could Be Read to Allow Certain Searches, It Cannot Support the Unzipping of Appellant's Jacket Because There Was No Reasonable Basis for Believing That the Unzipping Would Establish Or Negate Appellant's Connection to the Robbery Under Investigation***

Even assuming, *arguendo*, that the *Hayes dicta* might permit the police to unzip a suspect's jacket to facilitate a show-up if, *inter alia*, "there is a reasonable basis for believing" that doing so "will establish or negate the suspect's connection with th[e] crime" under investigation, *Hayes*, 470 U.S. at 817, the unzipping in this case would not qualify. There is nothing in the record to suggest that the police had a reasonable basis for believing the complainant's viewing of the generic blue sweatshirt worn by appellant would establish or negate his connection with the robbery.[2] Indeed, there is no finding – and

---

[2] The dissent notwithstanding, this is a point that appellant expressly made to the panel on appeal. *See* Appellant Panel Reply Br. at 5 & n.1 (arguing that "justification for creating a new exception to the Constitution's prohibition against warrantless searches" is "particularly lacking in this case in which the clothing that the officer

there was no suggestion – that the complainant said the "blue sweatshirt" worn by the robber was distinctive in any way that might have distinguished it from others, let alone in a way that would have established or negated a wearer's connection to the crime.  *Cf. Hayes*, 470 U.S. at 812 (police sought suspect's fingerprints to compare with latent prints found at rape scene); *Class*, 475 U.S. at 111 (police sought to view vehicle identification number).  Nor did the witness even suggest that seeing whether appellant was wearing such a sweatshirt would enable her to make an identification when seeing appellant's face had not, although we need not decide here whether that would have made a difference.  Hence, even if the Government is correct that *Hayes* can be read to permit a search to facilitate a show-up under certain circumstances, the factual predicate for application of the *Hayes dicta* is absent here.[3]

---

sought to reveal was a blue sweatshirt under a dark jacket, not distinctive clothing that might have distinguished appellant from others").

[3]  Part III.D should not be read to suggest that if the police officers in this case had a reasonable basis for believing that unzipping Askew's jacket could merely help facilitate the witness' identification, the *Hayes* dicta would be satisfied.  That is not the holding of the court.  Rather, what we have said is that, assuming the *Hayes dicta* applies, the police in this case did not have a reasonable basis for believing that unzipping appellant's jacket would *establish or negate* appellant's connection with the robbery for which he was stopped.  Six members  of the court – a majority – join in Part III.D, equally convinced that the Government's argument resting on the *Hayes dicta* holds no water in this case.

**E.** ***The Government's Alternative Argument, That the Unzipping Can Be Justified as an Objectively Reasonable Continuation of the Protective Frisk, Is Unsupported by the District Court's Factual Findings***

The Government's alternative argument, that the unzipping can be justified as an objectively reasonable response to appellant's alleged resistance during the pat down, is without support in the District Court's factual findings. The Government never challenged the District Court's findings as clearly erroneous. Quite the contrary, it described those findings as "consistent with the government's evidence at the suppression hearing." Gov't Panel Br. at 9. And pursuant to those findings, we can ascertain no basis for concluding, as the Government urges, that "it was objectively reasonable for Officer Willis to complete the protective frisk of appellant . . . by unzipping appellant's jacket." Gov't Supplemental Br. at 9.

The essence of the Government's argument is that when the complaining witness was brought to the scene, Officer Koenig broke off the pat down of appellant so that appellant could be presented to the complaining witness for identification. *Id*. at 7. According to the Government, prior to the show-up, appellant had resisted Officer Koenig's attempt to pat him down. *Id*. at 7-8, 11. The Government thus contends that because appellant "thwarted" Officer Koenig's pat down of his outer clothing, "it was objectively reasonable for [Officer Willis] to unzip appellant's jacket to determine whether he had a weapon in his waist area." *Id.* at 11. In other words, the Government argues that while Officer Willis's subjective intent in unzipping appellant's jacket during the show-up was to reveal to the complaining witness what appellant wore underneath the jacket, that unzipping was an objectively reasonable continuation of Officer Koenig's allegedly thwarted pat down for weapons.

Tellingly, the Government does not cite to the District Court's factual findings in support of this argument. Rather, it

cites to testimony that the District Court noted, but did not credit. *See id.* at 7. Thus, contrary to what the Government suggests, the District Court did not find that appellant resisted or thwarted Officer Koenig's pat down. Rather, referring in a footnote to the testimony on which the Government rests its argument, the District Court merely noted that Officer Willis had "*suggested* that Officer Koenig had not completed the pat-down, *perhaps* because of some resistance by the defendant." *Askew*, 313 F. Supp. 2d at 3 n.2 (emphasis added). In other words, the District Court declined to find either that the pat down was incomplete or that appellant had in any way resisted the pat down. Indeed, the court explicitly characterizes Officer Willis's testimony on these two points as a suggestion. Then, pointing to "[t]he government acknowledge[ment] that when Officer Koenig patted the defendant down, he did not find anything," the court reiterates its own finding that "[t]he subsequent discovery of the gun at issue was not the result of this pat-down." *Id.*; *see also id.* at 4 ("The initial pat-down of Officer Koenig did not reveal the presence of any weapon . . . ."). Thus, while we agree that the standard for determining reasonableness in the Fourth Amendment context is an objective one, *see Whren v. United States*, 517 U.S. 806 (1996); *United States v. (Rocky Lee) Brown*, 334 F.3d 1161, 1166-67 (D.C. Cir. 2004), we find that the District Court's unchallenged factual findings provide no support for the Government's argument that the unzipping here was objectively reasonable.[4]

---

[4] Our dissenting colleagues disagree with our reading of the District Court's opinion. But whatever the District Court did, it *certainly* did not make findings to support a safety-unzipping version of events, and we have no authority to make our own findings of fact. *See United States v. Burke*, 888 F.2d 862, 868-69 (D.C. Cir. 1989) ("The United States suggests that we might infer from the record that Burke was aware of the gun found in his tote bag. To engage in this

Even if the Government had challenged the District Court's factual findings as clearly erroneous, it could not succeed on its argument that the unzipping was an objectively reasonable continuation of the pat down, since that argument is based on a wholly implausible reading of the record. Consider the illogic of the Government's proposed characterization of Officer Willis's testimony: *Officers Koenig and Willis initiate a frisk, appellant places his hands on a police cruiser, and Officer Koenig pats down appellant's outer garments. But when Officer Koenig reaches appellant's waist, appellant leans repeatedly against the cruiser. Appellant thus "thwarts" Officer Koenig's efforts to frisk appellant's waist area and consequently provides what the Government describes as an objectively reasonable basis for undertaking a protective search for a weapon. But, at this point, because the pat down is "interrupted" by the arrival of another officer with the complaining witness, the officers do not undertake a protective search of appellant's waist area, complete the frisk, or otherwise act to ensure their safety and the safety of the complainant. Rather, they walk toward the complainant with an unhandcuffed robbery suspect who has successfully prevented them from completing a frisk of his person for weapons. See* Gov't Supplemental Br. at 7-8. This scenario makes no sense. Consequently, even if the Government had framed the issue pursuant to the correct standard of review, it could not have "definitely and firmly" convinced us that the District Court made a mistake when it chose not to credit Officer Willis's "*suggest[ion]* that Officer Koenig had not completed the pat-down, *perhaps* because of some resistance by the defendant, when Officer Benton arrived with the robbery victim for a show-up." *Askew*, 313 F. Supp. 2d at 3. n.2 (emphasis added).

---

sort of *de novo* factfinding, however, would be wholly inconsistent with the function of an appellate court.").

The total implausibility of the Government's reading of the record may explain why it abandoned any safety rationale before the District Court. In arguing its case at the close of the suppression hearing, the Government never suggested that there was anything about the pat down that provided objectively reasonable grounds for continuing the frisk or undertaking a protective search. Rather, dismissing the possibility of treating the initial unzipping as anything other than an act to facilitate the show-up, the Government confirmed for the District Court that Officer Koenig "didn't feel anything during the traditional pat-down that would have permitted [the officers] to go into the jacket at that point, but rather they then had the show-up." Mar. 26 Tr. at 38. The impossibility of reading the record as the Government now suggests may also explain why before the panel, as well as in its principal brief before the *en banc* court, the Government argued that the "sole" justification for the unzipping was to facilitate the show-up. *See* Gov't Panel Br. at 18; Gov't *En Banc* Br. at 22.[5]

---

[5] In asserting that the Government "pressed" the safety rationale in the District Court, our dissenting colleagues ignore the fact that the Government abandoned the safety rationale before the District Court. The Government's safety rationale was proffered before the completion of the two-day suppression hearing at a time when, by its own admission, the Government was unsure of what its officers would say regarding the circumstances surrounding the pat down. *See, e.g.*, Additional Case Law in Support of Government's Opposition at 2 & n.1(Mar. 19, 2004). Once Officer Willis testified to explain what transpired, *see* Mar. 26 Tr. at 8 ("I went to unzip [the jacket] down so that the show-up, they could see what he had on."), the Government consistently eschewed a safety rationale argument. Thus, in its closing arguments and supplemental filing before the District Court, its brief to the three-judge appellate panel, and its *en banc* brief, the Government relied solely on the argument that the initial partial unzipping of appellant's jacket was reasonable under the Fourth Amendment because it was a "minimal intrusion" that "facilitated a

Although we do not dispute that a protective search may be lawful when a suspect prevents the police from performing a *Terry* frisk, we conclude that neither the District Court's factual findings nor the evidentiary record support the conclusion that such was the situation here.

## IV. CONCLUSION

On the record of this case, the police officers violated appellant's Fourth Amendment rights by unzipping his jacket without his permission and without probable cause or a warrant. The judgment of the District Court must therefore be reversed and the case remanded.

*So ordered.*

---

show-up identification procedure by exposing clothing that matched the lookout description of a robbery suspect," Gov't Panel Br. at v; *see also id.* at 12, 18; Gov't *En Banc* Br. at vii, 13-15, 22-28; Gov't Panel Br. at 8 (summarizing the Government's argument before the District Court); Gov't *En Banc* Br. at 7 (same); Second Filing of Additional Case Law in Support of Government's Opposition at 4 (Mar. 31, 2004); Mar. 26 Tr. at 24, 26-27, 38. Not until after the *en banc* argument, when this court issued a supplemental briefing order asking the parties to address the possibility of justifying the initial unzipping on a safety rationale, did the Government again make the argument.

GRIFFITH, *Circuit Judge*, with whom *Circuit Judges* ROGERS and TATEL join except as to footnote 2, concurring: I agree that police officers violated Paul Askew's Fourth Amendment rights and so join the majority opinion in almost every respect. Given the importance of this appeal, I write separately to clarify my rationale for rejecting the government's principal argument before the en banc court. *Hayes v. Florida* noted in dicta that a brief detention for the purpose of fingerprinting a suspect is not necessarily an unconstitutional seizure. 470 U.S. 811, 816–17 (1985). The government argues that this dicta created a new exception to the probable cause requirement for evidentiary searches. Nothing the Supreme Court said in *Hayes* or its progeny supports this argument, and it is not our prerogative to create a new exception to the probable cause requirement of the Fourth Amendment. We are bound by Supreme Court precedent to subject the unzipping of Askew's jacket to "the textual and traditional standard of probable cause." *Arizona v. Hicks*, 480 U.S. 321, 329 (1987). Because the unzipping cannot satisfy that standard, I agree that we should reverse the judgment of the district court.

\* \* \*

When police officers unzipped Askew's jacket, they conducted a search of his person. Where zipping up creates a "reasonable expectation of privacy," *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), as it does in this case, to unzip is to search. *See, e.g.*, *New Jersey v. T.L.O.*, 469 U.S. 325, 347 (1985) (unzipping purse compartment); *New York v. Belton*, 453 U.S. 454, 456, 462–63 (1981) (unzipping jacket pocket); *United States v. Brown*, 671 F.2d 585, 586 (D.C. Cir. 1982) (per curiam) (unzipping pouch); *United States v. Waller*, 426 F.3d 838, 844 (6th Cir. 2005) (unzipping luggage). That the unzipping may have been minimally intrusive is immaterial. *See Hicks*, 480 U.S. at 328–29. The Fourth Amendment prohibits such a search in the absence of probable cause. *See Minnesota v.*

*Dickerson*, 508 U.S. 366, 373 (1993); *Hicks*, 480 U.S. at 325–29; *Almeida-Sanchez v. United States*, 413 U.S. 266, 269–70 (1973); *Chambers v. Maroney*, 399 U.S. 42, 51 (1970); *Sibron v. New York*, 392 U.S. 40, 62–66 (1968); *Henry v. United States*, 361 U.S. 98, 100–02, 104 (1959); *Carroll v. United States*, 267 U.S. 132, 149, 156 (1925).

The unzipping of Askew's jacket does not fit within any of the exceptions to the probable cause requirement that have been created by the Supreme Court. As I read the cases, these exceptions can be divided into two general categories. The officer safety cases allow a minimally intrusive search that protects officers from harm. *See, e.g.*, *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (protective frisk of outer clothing for weapons); *Maryland v. Buie*, 494 U.S. 325, 334 (1990) (protective sweep during home raid to prevent ambush); *New York v. Class*, 475 U.S. 106, 115–18 (1986) (officer not required to permit suspect's re-entry into car where weapon may be hidden); *Pennsylvania v. Mimms*, 434 U.S. 106, 109–11 (1977) (per curiam) (compelling suspect to alight from car during traffic stop); *United States v. Robinson*, 414 U.S. 218, 234–35 (1973) (search incident to arrest to disarm suspect before taking into custody). The special needs cases allow a search that advances a governmental end deemed by the Supreme Court to be weightier than the typical law enforcement interest. *See, e.g.*, *United States v. Knights*, 534 U.S. 112, 120–22 (2001) (monitoring probationers); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 619–20 (1989) (preventing intoxicated employees from operating railroads); *T.L.O.*, 469 U.S. at 340–41 (protecting schoolchildren); *Camara v. Municipal Court*, 387 U.S. 523, 534–39 (1967) (inspecting buildings for compliance with municipal code). These two types of exceptions do not apply to garden-variety searches for evidence, which are governed by the probable cause requirement. *See United States v. Colyer*, 878 F.2d 469, 478 (D.C. Cir. 1989).

3

The government concedes that probable cause to justify the unzipping was absent but makes no effort to fit the search of Askew within either category of established exceptions. Instead, the government argues that the search fits within a new exception created by *Hayes* for identification searches.[1] I find no basis in *Hayes* for that conclusion. The hunt for an identification-search exception begins, like so many efforts to weaken the probable cause requirement, with *Terry v. Ohio*. The government asserts that the search of Askew's person is not limited by probable cause because the purpose of the unzipping, identification of a suspect, was "reasonably related to the purpose of the *Terry* stop." Government's En Banc Br. at 14. *Terry* allows an officer lacking probable cause to make a "brief stop [(i.e., seizure)] of a suspicious individual, in order to determine his identity," *Adams v. Williams*, 407 U.S. 143, 145–46 (1972), so the government argues that a search calculated to identify a suspect should also be permissible on less than probable cause. The unspoken premise is that the power to search a suspect is as broad as the power to seize him. But this asks us to assume that whatever *Terry* said about "seizures" applies equally to "searches." In fact, *Terry*'s regime of stops and frisks distinguishes between the two. An officer lacking probable cause may seize a suspect to determine his identity, but must limit his search to a protective frisk for weapons. *See*

---

[1] The government has only recently come to regard *Hayes* as significant, having relegated the case to a single "*cf.*" citation in its brief to the three-judge panel. Government's Br. at 20. Now that two members of this court have opined that *Hayes* governs this matter, *United States v. Askew*, 482 F.3d 532, 540–45 (D.C. Cir. 2007), *vacated and reh'g en banc granted*, No. 04-3092 (D.C. Cir. July 12, 2007), the government has placed greater emphasis on the case. *See* Government's En Banc Br. at 12, 24, 25–26, 34 (citing *Hayes*); *id.* at ii (identifying *Hayes* as a "[c]ase[] chiefly relied upon").

*Minnesota v. Dickerson*, 508 U.S. 366, 373 (1993); *Michigan v. Long*, 463 U.S. 1032, 1052 n.16 (1983); *Ybarra v. Illinois*, 444 U.S. 85, 93–94 (1979); *Dunaway v. New York*, 442 U.S. 200, 210 (1979); *Sibron v. New York*, 392 U.S. 40, 65–66 (1968); *Terry*, 392 U.S. at 30; *see also* 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 9.6(g) (4th ed. 2004) ("[T]here is no search-for-evidence counterpart to the *Terry* weapons search, permissible on only a reasonable suspicion that such evidence would be found.") (quotation marks omitted). *Terry* allows an identification *seizure*. It does not permit an identification *search*.

The government, forced to look beyond *Terry* for its new exception, claims to have found it in the following language from *Hayes*, 470 U.S. at 816–17 (citations omitted):

> None of the foregoing implies that a brief detention in the field for the purpose of fingerprinting, where there is only reasonable suspicion not amounting to probable cause, is necessarily impermissible under the Fourth Amendment. In addressing the reach of a *Terry* stop in *Adams v. Williams*, we observed that "[a] brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." Also, just this Term, we concluded that if there are articulable facts supporting a reasonable suspicion that a person has committed a criminal offense, that person may be stopped in order to identify him, to question him briefly, or to detain him briefly while attempting to obtain additional information. There is thus support in our cases for the view that the Fourth Amendment would permit seizures for the purpose of fingerprinting, if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that

fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch. Of course, neither reasonable suspicion nor probable cause would suffice to permit the officers to make a warrantless entry into a person's house for the purpose of obtaining fingerprint identification.

The government contends that this passage, which nowhere mentions "searches," creates a new exception to the probable cause requirement for searches that facilitate identification of a suspect. *See* Government's En Banc Br. at 26. I reject that view.[2]

At issue in *Hayes* was the permissibility of *seizing* a person and transporting him to the stationhouse to obtain his fingerprints. The Supreme Court found the practice unconstitutional in light of another case about seizures, *Davis v. Mississippi*, 394 U.S. 721 (1969), which condemned a similar instance of stationhouse fingerprinting. Subsequent citations to *Hayes* confirm that the Court has only regarded it as a case about seizures. *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 187–89 (2004); *Kaupp v. Texas*, 538 U.S. 626, 630 n.2 (2003); *Tennessee v. Garner*, 471 U.S. 1, 8 (1985).

*Hayes*'s suggestion that fingerprinting might be permissible during a *Terry* stop does not reach searches, because the Supreme Court has never held that fingerprinting is a search. *See* 1 LAFAVE § 2.2(d) (noting that "it is to be doubted that the

---

[2] A majority of the court concludes that even if *Hayes* created an identification-search exception, the government cannot prevail because the police did not have a reasonable basis for believing that a view of the sweatshirt beneath Askew's jacket would establish or negate Askew's connection with the robbery. *See supra* Majority Opinion, Part III.D. I decline to join this portion of the opinion.

question of whether fingerprinting is a search can be taken as settled"). The Supreme Court offered conflicting views of the issue within *Hayes* itself. *Compare Hayes*, 470 U.S. at 814 (noting that fingerprinting does not involve "any of the probing into private life and thoughts that often marks interrogation and search"), *with id.* (implying that fingerprinting is a search by contrasting the practice to "other types of searches"); *see also Cupp v. Murphy*, 412 U.S. 291, 295 (1973) (contrasting fingernail scraping, a search, to fingerprinting, not a search). *Hayes*'s fingerprinting dicta dealt with what was then, and is still, a non-search investigative step.

*Hayes* is about a seizure, not a search, so it cannot have created a new exception that would permit the search of Askew's person in the absence of probable cause. The same is true of other cases the government cites in support of its purported identification-search exception. *See Hiibel*, 542 U.S. at 187–89 (upholding state stop-and-identify law as authorizing reasonable seizures); *Illinois v. Lidster*, 540 U.S. 419, 426–28 (2004) (allowing brief seizure at highway checkpoint to identify witnesses to hit-and-run accident); *United States v. Place*, 462 U.S. 696, 703–04 (1983) (allowing brief seizure of luggage to conduct dog sniff); *Michigan v. Summers*, 452 U.S. 692, 705 (1981) (allowing seizure of home occupants during execution of search warrant).

My adherence to the textual distinction between "searches" and "seizures" is consistent with the Supreme Court's Fourth Amendment jurisprudence. For example, the Court has justified a judgment about seizures by noting that it was not dealing with a search. *United States v. Martinez-Fuerte*, 428 U.S. 543, 561 (1976). The Court has also held that a search and a seizure require different types of proof before they are permissible. Consider *Terry v. Ohio* itself: A *Terry* stop (i.e., seizure) requires reasonable suspicion that criminal activity is afoot,

*United States v. Cortez*, 449 U.S. 411, 417–18 (1981), while a *Terry* frisk (i.e., search) requires reasonable suspicion that the stopped individual may have a weapon, *Terry*, 392 U.S. at 30. If there were no meaningful distinction between searches and seizures, then police would be justified in frisking every person they stopped, yet this is not what the law allows. *See Ybarra v. Illinois*, 444 U.S. 85, 92–93 (1979) (rejecting routine frisks unsupported by "a reasonable belief that [the person searched] was armed and presently dangerous") (citing *Adams*, 407 U.S. at 146, and *Terry*, 392 U.S. at 21–24). Finally, as we noted in *United States v. Colyer*, 878 F.2d 469, 479 (D.C. Cir. 1989), the Supreme Court has created analytical frameworks for seizures that it has never applied to searches:

> Although there may be no compelling reason to differentiate between seizures on the basis of their intrusiveness and failing to likewise differentiate between types of searches, the fact remains that we are unable to point to a single Supreme Court case that has upheld a search on reasonable suspicion merely because it was minimally intrusive.

This differing treatment is sensible, as the separate protections against unreasonable searches and unreasonable seizures safeguard different interests. *See Horton v. California*, 496 U.S. 128, 133 (1990) ("The right to security in person and property protected by the Fourth Amendment may be invaded in quite different ways by searches and seizures. A search compromises the individual interest in privacy; a seizure deprives the individual of dominion over his or her person or property."); *see also United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

\* \* \*

*Hayes* held that police cannot transport a suspect to the stationhouse for fingerprinting without probable cause, consent, or prior judicial authorization. 470 U.S. at 813–16. Its observation that "a brief detention in the field for the purpose of fingerprinting . . . is [not] necessarily impermissible under the Fourth Amendment," *id.* at 816, was unnecessary to decision of the case and so was dicta. *See Gersman v. Group Health Ass'n, Inc.*, 975 F.2d 886, 897 (D.C. Cir. 1992); *Cross v. Harris*, 418 F.2d 1095, 1105 n.64 (D.C. Cir. 1969); *Noel v. Olds*, 138 F.2d 581, 586 (D.C. Cir. 1943). The government concedes this point, Government's En Banc Br. at 26, but urges us to accord controlling significance to this dicta all the same. It is true that " '[c]arefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative.' " *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (quoting *Doughty v. Underwriters at Lloyd's, London*, 6 F.3d 856, 861 n.3 (1st Cir. 1993)) (alteration in original). But if anything more firmly commands the attention of the courts of appeals than Supreme Court dicta, it is Supreme Court holdings. By the time *Hayes* issued in 1985, the Supreme Court had already established the probable cause requirement for searches and its two categories of exceptions through a series of carefully articulated holdings.

The government now claims that dicta have overtaken holdings. I reject this argument because it reverses the accepted hierarchy of legal authority.[3] If there is to be an identification-

---

[3] *See, e.g.*, *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 379 (1994) ("It is to the holdings of our cases, rather than their dicta, that we must attend . . . ."); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[W]e think it generally undesirable, where holdings of the Court are not at issue, to dissect the sentences of the United States Reports as though they were the United States Code."); *Hawks v.*

search exception to the probable cause requirement of the Fourth Amendment, we must leave it for the Supreme Court to create. *Cf. Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of [the Supreme Court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decisions."). The government would have us believe that *Hayes* pierced a new hole in the probable cause requirement by way of an aside about fingerprinting. But just as Congress does not "hide elephants in mouseholes," *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001), the Supreme Court "does not decide important questions of law by cursory dicta inserted in unrelated cases," *In re Permian Basin Area Rate Cases*, 390 U.S. 747, 775 (1968). The officer safety and special needs exceptions to the probable cause requirement were announced in cases that made clear the magnitude of the Fourth Amendment moment and that altered the course of the law through abundant progeny. The supposed *Hayes* identification-search exception, by contrast, came into this world unannounced and lay idle until two judges on a three-judge panel of this court employed it over twenty years later. I think the Supreme Court would be surprised to learn that *Hayes* created an exception to the probable cause requirement, for it "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*." *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000).

Judicial creation of a constitutional code of criminal procedure has given the Supreme Court primary responsibility for regulating police behavior. *See generally* Henry J. Friendly, *The Bill of Rights as a Code of Criminal Procedure*, 53 CAL. L.

---

*Hamill*, 288 U.S. 52, 58–59 (1938) (noting that "an authority [can] be ranked as a definitive holding or merely a considered dictum").

REV. 929 (1965); William J. Stuntz, *The Political Constitution of Criminal Justice*, 119 HARV. L. REV. 780 (2006). With regard to evidentiary searches, the Supreme Court has drawn the line of constitutional "unreasonab[ility]" at probable cause. *See Arizona v. Hicks*, 480 U.S. 321, 329 (1987); *cf. Dunaway v. New York*, 442 U.S. 200, 214 (1979) (noting, in a case concerning seizures, that "the requisite 'balancing' has been performed in centuries of precedent and is embodied in the principle that seizures are 'reasonable' only if supported by probable cause"). *Hayes* created no exception to the Supreme Court's probable cause requirement for searches, be they for identification or any other investigatory purposes. As a court of appeals, we are in no position to create a new exception that would have far-reaching effects on how the police may properly investigate crime. Rather, we are bound by Supreme Court precedent, which in this case requires probable cause to support the unzipping of Askew's jacket. Because there was none, I agree that we should reverse the judgment of the district court denying Askew's motion to suppress evidence of the firearm.

KAVANAUGH, *Circuit Judge*, with whom *Chief Judge* SENTELLE and *Circuit Judges* HENDERSON and RANDOLPH join, dissenting:

On a December night in 2003, a D.C. police officer stopped Paul Askew on a Washington street based on reasonable suspicion that Askew had just committed an armed robbery. Consistent with *Terry v. Ohio*, 392 U.S. 1 (1968), the police attempted to frisk Askew to ensure he was not carrying a weapon. After Askew resisted the frisk and the robbery victim arrived for a show-up procedure, the police partially unzipped Askew's outer jacket and discovered he was carrying a loaded .38 caliber gun. Because Askew was already a convicted felon, he was prosecuted in U.S. District Court for being a felon in possession of a firearm. After the District Court denied Askew's motion to suppress and ruled the gun evidence admissible, Askew pled guilty, reserving his right to appeal the Fourth Amendment issue.

In this Court, Askew accepts that the initial stop was lawful under the Fourth Amendment. Askew also acknowledges that the police could frisk him for purposes of officer safety. But Askew contends that the police exceeded the scope of a permissible *Terry* frisk by partially unzipping his outer jacket, which in turn revealed his gun. He argues that the gun evidence therefore must be excluded.

We would uphold the search and affirm Askew's conviction for either of two alternative reasons. *First*, after Askew actively resisted and impeded the police's initial frisk attempt, unzipping Askew's outer jacket to search for a weapon around his waist area was an objectively reasonable protective step to ensure officer safety. *Second*, the police may reasonably maneuver a suspect's outer clothing – such as unzipping a suspect's outer jacket – when, as here, doing so could help facilitate a witness's identification at a show-up during a *Terry* stop.

Before explaining why we would affirm Askew's conviction, we point out that the legal import of today's long-pending and badly splintered en banc decision turns out to be zero.

On the protective search question, all 11 members of the en banc Court agree on the settled legal principle that "a protective search may be lawful when a suspect prevents the police from performing a *Terry* frisk." Maj. Op. at 43. But Part III(E) of Judge Edwards's opinion, which on this point is for a majority, concludes as a factual matter that the police here did not have an objective basis to unzip Askew's jacket as a protective step. Our difference with Part III(E) of the majority opinion is entirely fact-bound and depends solely on our different reading of the suppression hearing testimony and the District Court's opinion.

On the show-up issue, there is no majority decision either way on the legal question that we granted en banc review to decide: whether the police may reasonably unzip a suspect's outer jacket to help facilitate a witness's identification at a show-up during a *Terry* stop. Unlike the other nine judges on the en banc panel, Judges Ginsburg and Garland have not reached that legal question: In their view, the facts of this case do not present it. They thus do not join Part III(A)-(C) of Judge Edwards's opinion on the show-up issue; but they also do not join Part II(B) of our opinion. On the show-up issue, they join only the single, fact-bound paragraph in Part III(D) of Judge Edwards's opinion, thereby making Part III(D) the entirety of the majority's opinion on that issue. That paragraph assumes arguendo that the police may "unzip a suspect's jacket to facilitate a show-up if, *inter alia*, 'there is a reasonable basis for believing' that doing so 'will establish or negate the suspect's connection with the crime' under investigation." Maj. Op. at 37 (quoting *Hayes v. Florida*, 470

3

U.S. 811, 817 (1985) (alteration omitted)). But Part III(D) finds on the facts of this case that the police did not have a sufficient factual predicate to unzip Askew's jacket.

The fact-based approach of Judges Ginsburg and Garland, as reflected in their joining only Part III(D) of Judge Edwards's opinion on the show-up issue, is the narrowest ground necessary for reversing the conviction and thus constitutes the binding expression of the en banc Court on that issue. *Cf. Marks v. United States*, 430 U.S. 188, 193 (1977). As a result, there is no decision of the Court with respect to the legal question that was decided by the divided three-judge panel and listed without dissent as the only issue in the order granting en banc review. That question will remain unanswered in this Circuit and will have to be decided anew in future cases by other district court judges and three-judge panels of this Court, and perhaps ultimately by another en banc panel. For purposes of future decisions on the show-up issue, in other words, Part III(A)-(C) of Judge Edwards's opinion and Part II(B) of our opinion carry equal precedential weight, which is to say they carry no precedential weight at all.

I

At about 11:00 p.m. on December 19, 2003, minutes after an armed robbery in Washington, D.C., a police dispatcher broadcast the location of the crime and the victim's description of the armed robber, saying among other things that the perpetrator was wearing a blue sweatshirt. Metropolitan Police Department Officer Bowman then stopped Paul Askew on a street near the robbery because Askew appeared similar to the radio description. After Officer Bowman stopped Askew, Officers Willis and Koenig arrived at the scene and decided to frisk Askew "for officers

safety" and "to make sure he wasn't armed or anything." Mar. 26 Tr. at 6. Consistent with *Terry v. Ohio*, 392 U.S. 1 (1968), Officer Koenig directed Askew to put his hands on the police car and then tried to frisk him. Mar. 26 Tr. at 6-7. But according to Officer Willis, as Officer Koenig attempted to frisk Askew "towards his waist" and then "continued to try to pat him down," Askew "kept leaning up against the cruiser that his hands was on." *Id.* at 8. (The two other officers who testified at the suppression hearing also stated that Askew was uncooperative at various times during the encounter. Mar. 10 Tr. at 17, 40-42, 47.)

According to Officer Willis, while Officer Koenig was attempting to conduct the frisk and Askew was resisting, the robbery victim arrived in another police car for a show-up. Mar. 26 Tr. at 8. Officer Willis turned Askew around so that the robbery victim could see him. *Id.* Officer Willis remembered that the police dispatcher had said the robber was wearing a blue sweatshirt. *Id.* Officer Willis stated that he "wanted to expose the blue hooded sweatshirt to the victim to make sure that that's what she saw." *Id.* at 9. He therefore partially unzipped Askew's outer jacket so that the victim could get a better view of Askew's clothing, specifically the blue sweatshirt underneath Askew's outer jacket. *Id.* at 8-9. At that point, Officer Willis did not know whether the show-up witness had identified Askew as the robber. *Id.* at 18-19. The unzipping of Askew's jacket revealed his loaded .38 caliber gun. *Id.* at 9-11.

Askew was prosecuted for being a felon in possession of a firearm. Askew moved to suppress the gun evidence, arguing that the police violated the Fourth Amendment when they unzipped his jacket during the show-up. The District Court rejected Askew's argument, explaining that partially unzipping Askew's jacket reasonably facilitated the show-up

by allowing the witness to obtain a better view of Askew's clothing.  *United States v. Askew*, 313 F. Supp. 2d 1 (D.D.C. 2004) (Friedman, J.).

## II

The Fourth Amendment provides:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. CONST. amend. IV.  As the Supreme Court has explained, the text of the Fourth Amendment does not prohibit all searches and seizures without probable cause and a warrant.  Rather, the "touchstone of the Fourth Amendment is reasonableness."  *United States v. Knights*, 534 U.S. 112, 118 (2001).[1]

---

[1] *See also Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (Fourth Amendment's "central requirement is one of reasonableness.") (internal quotation marks omitted); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996) ("We have long held that the touchstone of the Fourth Amendment is reasonableness.") (internal quotation marks omitted); *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) ("The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable."); *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1977) ("The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.") (internal quotation marks omitted); Akhil Reed Amar, *Fourth Amendment First Principles*, 107 HARV. L. REV. 757, 759 (1994) ("We need to read the Amendment's words and take them seriously: they do not require warrants [or] probable cause, . . . but they do require that all searches and seizures be reasonable.").

Reasonableness "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The test "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion." *United States v. Hensley*, 469 U.S. 221, 228 (1985); *see also Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968).

The Supreme Court has conducted the Fourth Amendment reasonableness inquiry in common-law fashion and has developed rules and standards for different categories of search-and-seizure situations – including "the quantum of evidence needed for certain distinct kinds of official action." 4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.1(e), at 279 (4th ed. 2004). In some categories, the Court has required individualized probable cause, usually supported by a judicial warrant. In situations where the Court has determined that the government need outweighs the individual interest, the Court has allowed warrantless searches and seizures without probable cause – for example, with only reasonable suspicion or in some cases even with no individualized suspicion.[2]

---

[2] For cases involving warrantless searches without probable cause, *see*, *e.g.*, *United States v. Knights*, 534 U.S. 112, 119-22 (2001) (allowing search of probationer's home on reasonable suspicion); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653-65 (1995) (upholding school's policy of suspicionless drug testing of student athletes); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 667-77 (1989) (allowing suspicionless urinalysis of United States Customs employees who applied for promotions); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 620-34 (1989) (upholding suspicionless urine, blood, and breath testing of railroad employees); *O'Connor v. Ortega*, 480 U.S. 709, 722-26 (1987) (allowing search of government employee's office on

7

A

We would hold that the gun evidence in this case is admissible because unzipping Askew's jacket to search for a weapon in his waist area was an objectively reasonable protective step to ensure officer safety after Askew's resistance to the initial *Terry* frisk attempt.

In *Terry v. Ohio*, the Supreme Court held that the police – without a warrant and based on reasonable suspicion that an individual committed, was committing, or was about to commit a crime – may stop the suspect for further investigation and conduct a protective frisk for weapons or other instruments of assault. 392 U.S. at 19-27. The Supreme

---

reasonable suspicion that search would produce evidence of work-related misconduct); *New Jersey v. T.L.O.*, 469 U.S. 325, 340-42 & n.8 (1985) (permitting school authorities to search student upon reasonable grounds for suspecting violation of school rule); *New York v. Belton*, 453 U.S. 454, 459-62 (1981) (allowing searches incident to lawful arrest without additional justification); *cf. Camara v. Mun. Court*, 387 U.S. 523, 534-40 (1967) (allowing warrantless administrative searches by municipal health and safety inspectors). For cases involving warrantless seizures without probable cause, *see*, *e.g.*, *Illinois v. Lidster*, 540 U.S. 419, 427-28 (2004) (allowing suspicionless stops of motorists to seek information regarding recent hit-and-run accident); *Michigan v. Sitz*, 496 U.S. 444, 451-55 (1990) (upholding highway sobriety checkpoint without any individualized suspicion); *Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (allowing stop of vehicle to check license and registration on reasonable suspicion that motorist is unlicensed or automobile is unregistered); *Mimms*, 434 U.S. at 108-11 (allowing officers conducting traffic stop to order driver out of car even if they lack particularized reason for believing driver possesses a weapon); *United States v. Martinez-Fuerte*, 428 U.S. 543, 557-62 (1976) (allowing suspicionless stops at border-control checkpoints).

Court has allowed protective frisks during *Terry* stops because police officers are at great risk during those encounters. *See, e.g.*, *Michigan v. Long*, 463 U.S. 1032, 1052 (1983). The Court has explained that the Fourth Amendment does not require officers to choose between investigating criminal activity and avoiding violent attack. On the contrary, "it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties." *Terry*, 392 U.S. at 23. A "policeman making a reasonable investigatory stop should not be denied the opportunity to protect himself from attack by a hostile suspect." *Adams v. Williams*, 407 U.S. 143, 146 (1972).

Those cases and principles have led courts to establish what by now is a well-settled corollary to the *Terry* frisk doctrine: When a suspect hinders the police from adequately performing the initial *Terry* frisk, officers may protect themselves by following up with reasonable steps to determine whether the suspect is concealing a weapon. *See* Maj. Op. at 43 ("[W]e do not dispute that a protective search may be lawful when a suspect prevents the police from performing a *Terry* frisk . . . .").[3]

---

[3] *See Inouye v. Kemna*, 2007 WL 2669540, at *1-2 (9th Cir. 2007) (officer justified in reaching into suspect's pockets after suspect evaded frisk); *State v. Heitzmann*, 632 N.W.2d 1, 9 (N.D. 2001) ("Courts have recognized that a more intrusive *Terry* search may be constitutionally permissible when the detainee attempts to prevent an officer from performing an effective pat-down."); 4 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 9.6(b) & nn.190, 194 (4th ed. 2004) (collecting cases holding that further search is warranted when suspect resists frisk or makes sudden move toward the place where weapon may be hidden); *cf. Adams v. Williams*, 407 U.S. 143, 147-48 (1972) (officer justified in directly retrieving gun from suspect's waist when suspect did not comply with

In analyzing whether the police here could unzip Askew's jacket as a protective step to ensure officer safety, we are not limited to examining the officer's *subjective* intent (which, according to the testimony, was to facilitate the show-up). Rather, we consider whether the officer had *objectively* reasonable grounds to unzip Askew's jacket for purposes of officer safety. *See Terry*, 392 U.S. at 21-22; *cf. Whren v. United States*, 517 U.S. 806, 812-13 (1996); *Scott v. United States*, 436 U.S. 128, 136-38 (1978). As then-Judge Roberts explained, the "propriety of a search under the Fourth Amendment depends on an objective assessment of the officer's actions in light of the facts and circumstances

---

officer's request to exit car); *United States v. Thompson*, 597 F.2d 187, 191 (9th Cir. 1979) (officer justified in reaching into suspect's pocket after suspect repeatedly tried to reach into his pocket despite warnings not to and bulky coat prevented officer from determining from pat-down whether pocket contained weapon); *United States v. Vaughn*, 1994 WL 119002, at *2 (D.C. Cir. 1994) (officer justified in forcibly removing suspect's hands from his pockets after suspect made abrupt movement: "The whole point of a protective search conducted under the aegis of the *Terry* stop is to secure the officer's safety while investigating suspected criminal activity. Where a target of a *Terry* stop makes abrupt movement towards areas of his body that might harbor a weapon, officers have good reason to be wary and to take adequate precautionary measures."); *United States v. Cherr*y¸ 767 F. Supp. 285, 286 (D.D.C. 1991) ("Generally, *Terry* searches consist of patdowns; however, numerous cases have approved searches without a preceding patdown where the exigent circumstances of the stop justify immediate action by the police. Such cases invariably involve threatening gestures or sudden movements by the person being searched or other conditions which courts have found to be sufficiently exigent to warrant an increased intrusion upon the defendant's person."); *State v. Roach*, 796 A.2d 214, 219-20 (N.J. 2002) (officers justified in removing item from suspect's pants when suspect refused to obey the officers' orders and "continued to move his hands toward the unidentified bulge").

confronting him at the time and not on the officer's own subjective intent in executing the search." *United States v. Holmes*, 385 F.3d 786, 790 (D.C. Cir. 2004) (internal quotation marks and citation omitted); *see also United States v. Jackson*, 415 F.3d 88, 91 (D.C. Cir. 2005) ("[O]fficers' actual motives for conducting the search are not relevant as long as their actions were objectively reasonable.") (internal quotation marks and alterations omitted); *United States v. McKie*, 951 F.2d 399, 402 (D.C. Cir. 1991) ("[W]e are not limited to what the stopping officer says or to evidence of his subjective rationale . . . ."). The majority agrees that the officers' subjective intent is not relevant. Maj. Op. at 40 ("[W]e agree that the standard for determining reasonableness in the Fourth Amendment context is an objective one.").

Applying those settled principles to this case is straightforward. Askew concedes that, based on the victim's description, the police had reasonable suspicion to believe he just committed an armed robbery. The police officers also knew at the moment of unzipping that Askew had resisted the initial frisk attempt and tried to prevent them from feeling his waist area. Because of Askew's resistance and evasive movements, the officers had an objectively reasonable basis to protect themselves by unzipping Askew's jacket to determine whether Askew was concealing a weapon at his waist area – which, in fact, he was.

It bears emphasis that the officers did not skip the *Terry* frisk and immediately unzip Askew's jacket. *Cf. Adams*, 407 U.S. at 147-48; *United States v. Casado*, 303 F.3d 440, 447-48 (2d Cir. 2002); *United States v. Vaughn*, 1994 WL 119002, at *1-2 (D.C. Cir. 1994). On the contrary, the officers started with the *Terry* frisk. After a suspect actively attempts to impede a frisk, as Askew did here, it is entirely reasonable and proportional for officers to conduct a targeted and limited

search for weapons. *Cf. Adams*, 407 U.S. at 147-48. Such a two-step approach represents textbook compliance with the requirements of *Terry*. *See id.* On the facts of this case, therefore, unzipping Askew's jacket to search for a weapon in his waist area was an objectively reasonable protective step to ensure officer safety during the *Terry* stop.

Part III(E) of Judge Edwards's opinion, which on this point is for a majority, reads the record of this case differently. According to the majority, the District Court found that the officers completed the frisk after Askew's interference, and that Askew's interference therefore could not justify any follow-up protective search. But the problem for the majority opinion is that the District Court made no such finding. On the contrary, the District Court expressly recounted Officer Willis's testimony that, at the time of the unzipping, "Officer Koenig had not completed the pat-down, perhaps because of some resistance by the defendant." *United States v. Askew*, 313 F. Supp. 2d 1, 3 n.2 (D.D.C. 2004). The District Court gave no indication that it did not credit Officer Willis's testimony. And we see no reason why the District Court would have *explicitly* recited this testimony while somehow intending to *implicitly* discredit it; that interpretation of the District Court's opinion frankly does not make sense. The fact that Askew impeded Officer Koenig's attempts to pat him down is otherwise uncontroverted in the record. Officer Willis's testimony thus establishes that, at the time of the unzipping, the officers' initial frisk was not complete, and the officers' concern about Askew's interference with the initial frisk attempt had not dissipated.

The majority nonetheless refers to what it calls the "total implausibility" of a scenario whereby the police would have walked "toward the complainant with an unhandcuffed robbery suspect who has successfully prevented them from

completing a frisk of his person for weapons." Maj. Op. at 42, 41. But the majority's replay-booth-like review does not acknowledge how quickly the events transpired; the unzipping of the jacket occurred within seconds of Askew's resistance and simultaneously with the show-up – all while the victim remained in the police cruiser. The majority has had months to unpack and second-guess those split-second police decisions. The officers did not have that luxury. Events do not unfold in super slow motion in the real world in which police officers operate. Moreover, with respect, it's the majority's version of events that is implausible: The majority claims that the police completed a full frisk of Askew after Askew initially resisted, yet still somehow failed to discover the loaded .38 caliber gun at his waist. The majority's conclusion thus *necessarily* rests on an assumption that the officers here were dangerously incompetent. We see no basis, however, for such an assumption.

In an effort to bolster their strained reading of the factual record, the majority tries to suggest that the Government has not pressed the protective search argument, as if the Government somehow conceded the point. That is inaccurate. The Government argued before the District Court that the unzipping was a reasonable protective step to ensure officer safety; indeed, that was the Government's primary contention. *See* Additional Case Law in Support of Government's Opposition to Defendant's Motion to Suppress Tangible Evidence at 2-5, United States v. Askew, 313 F. Supp. 2d 1 (D.D.C. 2004) (No. 1:04-cr-10). After the District Court expressed its preliminary belief that the unzipping of Askew's jacket was better justified on a show-up rationale, the Government instead focused on that alternative argument, which ultimately was the sole basis for the District Court's ruling. The Government never conceded the search was not justified as a protective search. On the contrary, the

Government continues to support this officer safety rationale: "Given that appellant had successfully resisted an officer's 'continued' attempts to conduct a more traditional pat-down, it was objectively reasonable for the police to unzip appellant's jacket to determine whether he had a weapon in his waist area." Gov't Supp. En Banc Br. at 11.

All of that said, our fact-based disagreement with the majority on the protective search issue simply underscores that, at least as to that question, this is a routine, fact-bound Fourth Amendment case where different Judges happen to interpret the evidence and the District Court's opinion differently.[4] In other words, the majority's protective search analysis works no change in and does no harm to Circuit precedent on the permissibility of protective searches following a suspect's interference with a *Terry* frisk. *See* Maj. Op. at 43 ("[W]e do not dispute that a protective search may be lawful when a suspect prevents the police from performing a *Terry* frisk . . . .").

B

As an alternative basis for upholding the search and affirming the conviction, we would conclude that unzipping Askew's jacket was a reasonable investigative step to facilitate the show-up procedure. In our judgment, the police may reasonably maneuver a suspect's outer clothing, such as removing a suspect's hat or sunglasses or unzipping a suspect's outer jacket, when doing so could help facilitate a witness's identification at a show-up during a *Terry* stop.

---

[4] It bears mention that this fact-based disagreement between the majority opinion and our opinion likely would have been avoided had the officer who conducted the initial frisk (Officer Koenig) been called to testify at the suppression hearing.

In *Terry v. Ohio* and *Sibron v. New York*, the Supreme Court held that the police may forcibly stop a suspect without probable cause if they have reasonable suspicion of a crime. *See Terry*, 392 U.S. at 21-23; *Sibron*, 392 U.S. 40, 63-64 (1968). In explaining the permissible contours of a *Terry* stop, the Court stated that the officer's actions during the stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. Applying that standard, the Court then considered whether police may *search* a suspect during a *Terry* stop by conducting (i) a protective frisk for weapons or instruments of assault that could be used to harm officers or (ii) an "exploratory search" for contraband or evidence of crime possessed by the suspect. *See id.* at 24-31. The Court permitted the police to perform protective frisks for weapons or other instruments of assault, finding that the government interest in officer safety outweighed the individual privacy interest. *See id.*; *see also Adams*, 407 U.S. at 146; *cf. Sibron*, 392 U.S. at 65. But the Court prohibited, in the absence of probable cause, what the Court has variously called "exploratory," "evidentiary," or "full" searches for contraband or evidence of crime that the suspect might be carrying.[5]

---

[5] *See Terry*, 392 U.S. at 30 (prohibiting "general exploratory search" aimed at recovering "whatever evidence of criminal activity [officer] might find"); *Sibron*, 392 U.S. at 64-66 (distinguishing protective search for weapons from search for narcotics); *see also Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993) (prohibiting "evidentiary search," namely one raising prospect that officer will "rummage and seize at will" beyond "specific authorization" of *Terry* stop) (internal quotation marks omitted); *Florida v. Royer*, 460 U.S. 491, 499 (1983) (plurality opinion of White, J.) ("police may not carry out a full search of the person or of his automobile or other effects" during *Terry* stop); *cf. Maryland v. Buie*, 494 U.S. 325, 335 (1990) (distinguishing "cursory inspection" from "full

A search that consists of unzipping a suspect's outer jacket to help facilitate a show-up cannot be pigeonholed into either of the two categories of police procedures addressed in *Terry*. Rather, such a search falls into a third category: "identification procedures." Identification procedures seek to match a suspect to a crime or crime scene and include, for example, fingerprints, palm prints, footprints, body measurements, saliva samples, hair samples, fingernail samples, fingernail scrapings, lineups and show-ups, photographs, voice samples, and handwriting samples. *See* MODEL CODE OF PRE-ARRAIGNMENT PROCEDURE § 170.1 (1975). Many such "identification procedures" constitute "searches" for purposes of the Fourth Amendment. Because identification procedures do not seek to uncover weapons, they are not the protective frisks that *Terry* permits. *Cf. Terry*, 392 U.S. at 24-31. But because identification procedures do not seek to uncover contraband or evidence of crime possessed by the suspect, they also are not the exploratory searches that *Terry* prohibits. *Cf. Minnesota v. Dickerson*, 508 U.S. 366, 378 (1993); *Sibron*, 392 U.S. at 64-66.

Applying the bedrock *Terry* principle that the police, with reasonable suspicion, may "stop the person for a brief time and take additional steps to investigate further," the Supreme

---

search"); *Skinner*, 489 U.S. at 638 (Marshall, J., dissenting) (describing past cases: "Only where the government action in question had a substantially less intrusive impact on privacy, and thus clearly fell short of a full-scale search, did we relax the probable-cause standard.") (internal quotation marks and citation omitted); *New York v. Class*, 475 U.S. 106, 118-19 (1986) (distinguishing permissible focused search of car's dashboard from full search of passenger compartment); *United States v. Jacobsen*, 466 U.S. 109, 125 n.28 (1984) (distinguishing fingernail scrapings from "full search").

Court has permitted a variety of identification procedures during *Terry* stops. *Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004). The Court has held that police may conduct show-ups, compel suspects to provide their identification, search a suspect's car to see the vehicle identification number, and take fingerprints. *See Michigan v. Summers*, 452 U.S. 692, 701 n.12 (1981) (show-ups); *Hiibel*, 542 U.S. at 185-89 (identification); *Hensley*, 469 U.S. at 229, 234 (identification); *New York v. Class*, 475 U.S. 106, 119 (1986) (vehicle identification number); *Hayes v. Florida*, 470 U.S. 811, 817 (1985) (fingerprinting); *cf. Davis* v. *Mississippi*, 394 U.S. 721, 727-28 (1969) (fingerprinting). The Supreme Court has authorized those various identification procedures during *Terry* stops – that is, without a warrant or probable cause – so long as the procedures were reasonable under the circumstances. In no case has the Supreme Court prohibited an identification procedure during a *Terry* stop.

Askew argues, however, that only those identification procedures that do not constitute Fourth Amendment "searches" are permissible during *Terry* stops. We disagree.

1

In *Hayes v. Florida*, the Supreme Court authorized fingerprinting during *Terry* stops "if there is reasonable suspicion that the suspect has committed a criminal act, if there is a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime, and if the procedure is carried out with dispatch." 470 U.S. at 817. In reaching that conclusion, the Court recognized that fingerprinting is a Fourth Amendment search, albeit a "much less serious intrusion upon personal security than *other* types of searches and detentions." *Id.* at 814 (emphasis added); *see generally Katz v. United States*, 389 U.S. 347

(1967). *Hayes* thus stands for the proposition that an identification procedure constituting a search is permissible during a *Terry* stop if the procedure is reasonable under the circumstances.

Askew dismisses the import of *Hayes* by suggesting that fingerprinting is not a search. Askew's position ignores the *Hayes* language comparing fingerprinting to "*other* types of searches and detentions." *Hayes*, 470 U.S. at 814 (emphasis added). Moreover, if Askew were correct, the Supreme Court could not have limited fingerprinting during *Terry* stops to cases where the police have a "reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime." *Id.* at 817. In other words, if fingerprinting were not a search, the police would not have to make *any* showing to take fingerprints during any – or indeed every – *Terry* stop. That is obviously not what *Hayes* held; in fact, *Hayes* said just the opposite.[6]

---

[6] In a 1973 case, the Supreme Court hinted in dicta that fingerprinting may not be a search. *See United States v. Dionisio,* 410 U.S. 1, 15 (1973). The leading Fourth Amendment scholar explains that this "dictum in *Dionisio* might be considered suspect." 1 LAFAVE, SEARCH AND SEIZURE § 2.6(a), at 668. The Court's later decision in *Hayes* plainly considered fingerprinting a search; the *Hayes* language and requirement for some evidentiary showing by the police to obtain fingerprints during a *Terry* stop cannot be explained otherwise. Therefore, although some of the Supreme Court's pre-*Hayes* language "indicates that a person does not have a reasonable expectation of privacy in his or her fingerprints, which is to say that the police actions of taking a fingerprint would not be a search within the meaning of the Fourth Amendment, in *Hayes*, the Court signaled that a person has a protected interest, albeit a diminished one, in the taking of his or her fingerprints." Thomas K. Clancy, *What Is a "Search" Within the Meaning of the Fourth Amendment?*, 70 ALB. L. REV. 1, 8 n.39 (2006). *Hayes* reflects and

In their separate opinion in *Hayes*, Justices Brennan and Marshall similarly interpreted the Court's majority opinion to allow a search (fingerprinting) without probable cause during a *Terry* stop. They strenuously objected to this result, however, because they argued – as Askew does here – that the only search permitted during a *Terry* stop is a protective frisk for weapons. They complained that on-site fingerprinting involves "a singular intrusion on the suspect's privacy" that is not "justifiable (as was the patdown in *Terry*) as necessary for the officer's protection." *Id.* at 819 (Brennan, J., concurring in judgment). Indeed, they labeled the majority's conclusion a "regrettable assault on the Fourth Amendment." *Id.* Of course, Justices Brennan and Marshall could call the *Hayes* majority opinion a "regrettable assault on the Fourth

---

is consistent with the modern trend in Supreme Court cases, which increasingly has been to recognize intrusive and invasive police practices as searches – and then to determine whether they are reasonable. *See Kyllo v. United States*, 533 U.S. 27, 34 (2001) ("We think that obtaining by sense-enhancing technology any information regarding the interior of the home that could not otherwise have been obtained without physical intrusion into a constitutionally protected area constitutes a search – at least where (as here) the technology in question is not in general public use.") (internal quotation marks and citation omitted); *Bond v. United States*, 529 U.S. 334, 337 (2000) (merely feeling or squeezing a passenger's bag is a search: "Physically invasive inspection is simply more intrusive than purely visual inspection."); *Skinner*, 489 U.S. at 616-17 (breath, blood, and urine collection and testing procedures are searches). The Supreme Court ordinarily no longer engages in the kinds of contortions it once arguably employed to find certain police procedures not to be searches. *See* Akhil Reed Amar, *Fourth Amendment First Principles*, 107 HARV. L. REV. 757, 769, 783-85 (1994) ("To avoid some of the absurdities created by the so-called warrant and probable cause requirements, the Justices have watered down the plain meaning of 'search' and 'seizure.'").

Amendment" only because the decision permitted a search (fingerprinting) on less than probable cause.

Askew also tries to discount the Supreme Court's reasoning in *Hayes* as dicta. But the Supreme Court has treated this language from *Hayes* as authoritative. *See Hiibel*, 542 U.S. at 188-89. Moreover, the Court's analysis in *Hayes* was carefully considered; indeed, it was *the* point of strenuous disagreement between the *Hayes* majority and Justices Brennan and Marshall in their separate opinion. We have said that "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative." *United States v. Dorcely*, 454 F.3d 366, 375 (D.C. Cir. 2006) (internal quotation marks omitted); *see also Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003); *Natural Res. Def. Council, Inc. v. NRC*, 216 F.3d 1180, 1189 (D.C. Cir. 2000); *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997).

*Hayes* establishes that the identification procedure used in Askew's case was reasonable under the Fourth Amendment. Here as in *Hayes*, the identification procedure constituted a search. Here as in *Hayes*, the purpose of the identification procedure was to match a suspect with a serious crime that had just occurred and thereby protect the public from a violent criminal at large (a rapist in *Hayes*; an armed robber here). Here as in *Hayes*, the police had an objectively reasonable basis for believing that the identification procedure could help establish or negate the suspect's connection with a crime. Here as in *Hayes*, the intrusion on the suspect was relatively minimal; indeed, many people would think having their fingerprints taken on the street in plain view of the public is far more intrusive than having their outer jacket partially unzipped. Here as in *Hayes*, the police action was carried out with dispatch.

Contrary to Askew's suggestion, moreover, *Hayes* is no outlier. In *New York v. Class*, 475 U.S. 106, 118-19 (1986), the Supreme Court allowed the police during a *Terry* stop to conduct a limited search of a car so that they could see the car's vehicle identification number (VIN) – even though the search was not a protective search for weapons as permitted in *Terry* or *Michigan v. Long*, 463 U.S. at 1049. In her opinion for the Court, Justice O'Connor succinctly described the issue and holding:

> In this case, we must decide whether, in order to observe a Vehicle Identification Number (VIN) generally visible from outside an automobile, a police officer may reach into the passenger compartment of a vehicle to move papers obscuring the VIN after its driver has been stopped for a traffic violation and has exited the car. We hold that, in these circumstances, the police officer's action does not violate the Fourth Amendment.

*Class*, 475 U.S. at 107; *see also id.* at 132 (White, J., dissenting) (majority opinion "in effect holds that a search of a car for the VIN is permissible whenever there is a legal stop").

The reasoning of *Class* is murky in some places. But the bottom line of *Class* is crystal clear: During a *Terry* car stop, the police may conduct a limited *search* of the vehicle so as to see the VIN, *even though they are not searching for a weapon*. The decision in *Class*, like the opinion in *Hayes*, refutes Askew's position that the police may not conduct a reasonable search for identification purposes during a *Terry* stop.

Also instructive is the Supreme Court's decision in *Hiibel v. Sixth Judicial District Court*, 542 U.S. 177 (2004). Unlike *Hayes* and *Class*, *Hiibel* did not directly involve a search, but

it nevertheless underscored the importance of identification procedures during *Terry* stops. The Court held that police during *Terry* stops may compel suspects to provide their names and, pursuant to state law, may arrest suspects who refuse to do so, in which case the police necessarily may conduct a full search incident to arrest that would uncover the suspect's license or other form of identification. *Id.* at 185-88; *cf. State v. Flynn*, 285 N.W.2d 710, 719 (Wis. 1979) (allowing search for wallet with identification during *Terry* stop). The *Hiibel* Court explained that obtaining a person's identification during a *Terry* stop is a "commonsense inquiry" that "serves important government interests": It may "inform an officer that a suspect is wanted" or may "help clear a suspect and allow the police to concentrate their efforts elsewhere." 542 U.S. at 189, 186. The Court emphasized that the request for identification "does not alter the nature of the stop itself: it does not change its duration or its location." *Id.* at 188 (citations omitted). In response to concerns about police harassment, the Court noted that the police must have a reasonable basis for stopping the suspect and, indeed, cited *Hayes* for the proposition that "*Terry* may permit an officer to determine a suspect's identity by compelling the suspect to submit to fingerprinting only if there is 'a reasonable basis for believing that fingerprinting will establish or negate the suspect's connection with that crime.'" *Id.* (quoting *Hayes*, 470 U.S. at 817). *Hiibel* thus reinforces what *Hayes* and *Class* previously stated: Identification is a critical and legitimate component of *Terry* stops.

Consistent with the Supreme Court's precedents, a number of state legislatures and courts have long allowed law enforcement officers – with less than probable cause – to conduct identification procedures that constitute Fourth Amendment searches. *See* ARIZ. REV. STAT. ANN. § 13-3905; COLO. R. CRIM. P. 41.1; IDAHO CODE ANN. § 19-625; IOWA

CODE ANN. §§ 810.1 to .8; N.J. CT. R. 3:5A; N.C. GEN. STAT. ANN. §§ 15A-271 to -274; VT. R. CRIM. P. 41.1; *State v. Rodriguez*, 921 P.2d 643, 650-51 (Ariz. 1996) (en banc); *People v. Madson*, 638 P.2d 18, 31-33 (Colo. 1981) (en banc); *Wise v. Murphy*, 275 A.2d 205, 213-16 (D.C. 1971); *Bousman v. Iowa Dist. Court*, 630 N.W.2d 789, 796-99 (Iowa 2001); *State v. Hall*, 461 A.2d 1155, 1159-61 (N.J. 1983); *In re Fingerprinting of M.B.*, 309 A.2d 3, 6-7 (N.J. Super. Ct. App. Div. 1973); *In re Order Requiring Fingerprinting of a Juvenile*, 537 N.E.2d 1286, 1288-89 (Ohio 1989); *In re Nontestimonial Identification Order Directed to R.H.*, 762 A.2d 1239, 1243-47 (Vt. 2000). Most of those state rules and decisions broadly authorize the police to obtain a court order – *based only on reasonable suspicion* – to seize a suspect, compel the suspect's appearance at the police station or other location, and forcibly require the suspect to submit to an intrusive identification procedure. The Model Code of Pre-Arraignment Procedure similarly permits police based only on reasonable suspicion to obtain a court order, seize a suspect, and compel the suspect to submit to an identification procedure. MODEL CODE OF PRE-ARRAIGNMENT PROCEDURE § 170.2. Professor LaFave generally approves of these rules and decisions because certain "identification searches" do not "require the rummaging through a suspect's personal effects as does an ordinary full-blown search." 4 LAFAVE, SEARCH AND SEIZURE § 9.8(b), at 730 (internal quotation marks omitted). For that reason, Professor LaFave says: "Taking fingernail scrapings, for example, *is a search, but yet is a very limited intrusion, and thus should be deemed permissible*" even without probable cause. *Id.* (internal quotation marks omitted and emphasis added).[7]

---

[7] The Supreme Court has often looked to state laws, the Model Code of Pre-Arraignment Procedure, and Professor

In sum, the Supreme Court's precedents, the various state laws and decisions, the Model Code of Pre-Arraignment Procedure, and the views of the leading Fourth Amendment scholar all demonstrate that Askew's extreme interpretation of the Fourth Amendment is seriously flawed. Identification procedures constituting searches are permitted during *Terry* stops so long as the procedures are reasonable under the circumstances. Police may therefore reasonably maneuver a suspect's outer clothing – such as removing a suspect's hat or sunglasses or unzipping a suspect's outer jacket – when doing so could help facilitate a witness's identification at a show-up during a *Terry* stop. For that reason, it was reasonable for the police to unzip Askew's outer jacket so that the robbery victim could see his clothing and get a better view of his blue sweatshirt.

### 2

Askew argues that post-*Terry* decisions such as *Hayes*, *Class*, and *Hiibel*, as well as the various state statutes, rules, and opinions, do not resolve this case. For the reasons stated above, Askew's argument is wrong. But even absent all of those precedents and laws – in other words, based solely on *Terry* and general Fourth Amendment principles – Askew errs in arguing that the police are prohibited during *Terry* stops from conducting identification procedures constituting searches.

---

LaFave's treatise in considering the reasonableness of police practices under the Fourth Amendment. *See, e.g.*, *Brendlin v. California*, 127 S. Ct. 2400, 2407-08 (2007) (state court decisions and LaFave); *Illinois v. Lidster*, 540 U.S. 419, 425 (2004) (Model Code of Pre-Arraignment Procedure); *Atwater v. City of Lago Vista*, 532 U.S. 318, 344-45, 355-60 (2001) (state laws, Model Code of Pre-Arraignment Procedure, and LaFave).

In "evaluating the validity of an officer's investigative or protective conduct under *Terry*, the touchstone of our analysis is always the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security." *Long*, 463 U.S. at 1051 (internal quotation marks and alterations omitted). The police action during a *Terry* stop must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *see also Hensley*, 469 U.S. at 228 (reasonableness test "balances the nature and quality of the intrusion on personal security against the importance of the governmental interests alleged to justify the intrusion"); *Bell*, 441 U.S. at 559. Applying that standard, *Terry* says it is reasonable to frisk the suspect for weapons and unreasonable to search the suspect for contraband or evidence. The precise question in this case – again, assuming cases like *Hayes*, *Class*, and *Hiibel* do not already resolve it – is whether it is reasonable for the police to conduct identification procedures.

On the government interest side of the Fourth Amendment balance, when the police seek to conduct an identification procedure at a *Terry* stop, they know that a serious crime recently has been committed – usually a violent crime such as murder, rape, robbery, or assault – and that the perpetrator is on the loose. In such cases, speed is often of the essence, and tools to quickly establish or negate a suspect's connection with the crime are essential so that the police can determine whether to arrest the suspect or move on to someone else. Identification procedures at *Terry* stops therefore help to protect the public from violent criminals at large – an interest Judge Edwards's opinion never mentions.

On the other side of the Fourth Amendment balance, the primary intrusion on a suspect's individual privacy during a *Terry* stop results from the forcible stop itself and the initial

protective frisk.  The additional step of conducting a targeted identification procedure – such as unzipping an outer jacket during a show-up – is certainly an interference with individual privacy.  But it is a relatively minimal interference, especially as compared to numerous other searches that the Supreme Court has authorized without probable cause.  *Cf. Knights*, 534 U.S. at 119-22 (search of home); *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653-65 (1995) (urinalysis); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 667-77 (1989) (urinalysis); *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 620-34 (1989) (blood, breath, and urine testing); *O'Connor v. Ortega*, 480 U.S. 709, 722-26 (1987) (search of employee's office); *Class*, 475 U.S. at 114-119 (search of part of interior of defendant's car); *New Jersey v. T.L.O.*, 469 U.S. 325, 340-42 & n.8 (1985) (search of student); *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (driver asked to get out of car during *Terry* stop "is being asked to expose to view very little more of his person than is already exposed").

When balancing the competing interests, the consequences of accepting Askew's argument are important to consider.  Prohibiting the police during *Terry* stops from conducting identification procedures that constitute searches would lead to absurd and dangerous results.  It would mean that the police could not remove a suspect's gloves to perform the fingerprinting that *Hayes* expressly allows.  It would mean that the police could not remove a robbery suspect's hat during a show-up after an armed robbery.  It would mean that the police could not take off a suspected bank robber's ski mask.  It would mean that the police could not remove a murder suspect's shoe to take a shoe imprint during a *Terry* stop, even though a shoeprint was the key evidence at a murder scene.  *Cf. State v. Moffatt*, 450 N.W.2d 116, 120 (Minn. 1990).  It would mean that the police could not lift a

rape suspect's sleeve to view a tattoo on the suspect's forearm, even though the rape victim said the perpetrator had a distinctive tattoo on his forearm. It would mean that the police could not take a hair sample from a rape suspect during a *Terry* stop, even though the key piece of evidence at the rape scene was a hair from the perpetrator. *Cf. United States v. Ingram*, 797 F. Supp. 705, 716-18 (E.D. Ark. 1992). It would mean that the police during a *Terry* stop could not take fingernail scrapings or a saliva swab from a murder suspect in a case where the victim was killed in a violent struggle. *Cf. In re Shabazz*, 200 F. Supp. 2d 578, 584-85 (D.S.C. 2002). It would mean that a show-up is all but useless in certain cases, notwithstanding that the Supreme Court has long blessed show-ups during *Terry* stops. It would mean that a large number of state statutes, rules, and decisions permitting identification procedures on less than probable cause – which have been on the books for decades – are all unconstitutional and wrongly decided. In short, Askew's position would hamstring the police and prevent them from performing reasonable identification procedures that could solve serious crimes and protect the community from violent criminals at large.[8]

For those reasons, even if the *Hayes-Class-Hiibel* line of cases did not exist, the government need for identification

---

[8] Askew argues that his position – namely, that only those identification procedures not constituting searches under the Fourth Amendment are permitted during a *Terry* stop – provides a clear, bright-line rule. But that claim proved hollow at oral argument when Askew's skilled counsel could not answer, perhaps understandably given the state of the case law, numerous questions about whether certain identification procedures constitute searches under the Fourth Amendment. *See* Tr. of En Banc Oral Arg. at 3-12.

procedures during *Terry* stops outweighs the intrusion on individual privacy.[9]

We would hold that the police may conduct reasonable identification procedures at *Terry* stops; in particular, the police may reasonably maneuver a suspect's outer clothing – such as removing a suspect's hat or sunglasses or unzipping a suspect's outer jacket – when, as here, doing so could help facilitate a witness's identification at a show-up during a *Terry* stop. But we recognize, of course, that there is not a majority of the Court on the show-up issue for either our position or Judge Edwards's position as reflected in Part III(A)-(C) of his opinion. As a result, the legal question about the permissible scope of police activity at show-ups that we granted en banc review to decide remains undecided for now in this Circuit.

C

We close with a few observations about Part III(D) of Judge Edwards's opinion, which consists of just a single, fact-bound paragraph that constitutes the entirety of the binding opinion of the Court on the show-up issue.[10]

---

[9] A variety of conceivable searches would be more intrusive than the search at issue here. In such hypothetical cases, the Government would face a heavier burden to show that the investigative step was reasonable. *See Schmerber v. California*, 384 U.S. 757, 769-72 (1966); *Helton v. United States*, 191 F. Supp. 2d 179, 184-85 (D.D.C. 2002); *see also* 4 LaFave, Search and Seizure § 9.8(b), at 730 ("there may be a serious question as to whether the taking of a blood sample should be allowed" on less than probable cause).

[10] To reiterate: On the show-up issue, Judges Ginsburg and Garland join only the paragraph in Part III(D) of Judge Edwards's

That paragraph assumes arguendo that the police may "unzip a suspect's jacket to facilitate a show-up if, *inter alia*, 'there is a reasonable basis for believing' that doing so 'will establish or negate the suspect's connection with the crime' under investigation." Maj. Op. at 37 (quoting *Hayes*, 470 U.S. at 817 (alteration omitted)). But the paragraph then decides that the police in this case did not have a sufficient factual predicate to meet this standard. We disagree. It is generally reasonable for police to believe that unzipping a suspect's outer jacket could help facilitate a robbery witness's identification at a show-up. Even if a witness can readily see a suspect's face, allowing the witness to view the suspect's clothing would enhance the accuracy of the identification. That is particularly true where, as here, the witness had identified a specific item of the perpetrator's clothing when first reporting the crime, and the suspect appeared to be wearing that clothing under his outer jacket.

Because the robbery victim here specified a blue sweatshirt when she first reported the crime, the officers reasonably believed that the sweatshirt was a significant identifying factor for the victim. Officer Willis testified: "I remember they said the defendant had on a blue hooded sweatshirt, but [Askew] had his jacket zipped up. I wanted the complainant to see what he had on to make sure that he wasn't zipping nothing up to cover up. . . . [I] wanted to expose the blue hooded sweatshirt to the victim to make sure that that's what she saw." Mar. 26 Tr. at 8-9.

The police's belief was reasonable, moreover, even though the victim, when she first reported the crime, apparently did not indicate whether the perpetrator's sweatshirt had distinctive markings. The majority suggests

opinion; they do not reach the legal question addressed in Part III(A)-(C) of Judge Edwards's opinion.

that there was insufficient justification for allowing the victim to see Askew's sweatshirt because it would have been impossible for her to distinguish a "generic blue sweatshirt" from others. Maj. Op. at 37. But just because the victim did not mention a distinctive characteristic of the sweatshirt in her initial description doesn't mean allowing her to see Askew's sweatshirt would have been futile for identification purposes. The majority ignores the obvious point that there are numerous styles of "blue sweatshirts," and any shade, material, logo, pattern, or feature could have helped the victim match or distinguish Askew's sweatshirt from the one she recalled being worn by the robber. As the Government correctly notes, a "blue sweatshirt" could be "cotton or fleece, zippered or buttoned; and it could have pockets or a hood." Gov't Supp. En Banc Br. at 4 n.1. A "blue sweatshirt" could feature, among countless other things, an athletic company logo, a college mascot, a professional sports team name, or a corporate slogan. To be sure, a "blue sweatshirt" could also have none of those things, presumably rendering it the kind of plain old "generic blue sweatshirt" that the majority describes. But what is "generic blue"? One major manufacturer of sweatshirts lists 14 wildly variant shades of this "generic" color: Aqua, Baltic Blue, Blue, Cadet Blue, California Blue, Cornflower Blue, Granite Blue, Light Blue, Medium Stonewash, North Carolina Blue, Periblue, True Navy, True Royal, and Vintage Navy. *See* Jerzees Color Translation, at http:// www.jerzees.com/ jerzeesactivewear/ ColorTranslation .aspx. If the robber's "generic blue" sweatshirt had been "North Carolina Blue" but Askew's was "True Navy," that would have been the end of the matter and Askew would have walked. Or the victim alternatively might have said, "that's the sweatshirt and that's the robber."

The irony here, moreover, is that seeing the sweatshirt may actually have helped the victim rule Askew out as the

robber. Keep in mind that the end result of the show-up was that the robbery victim said Askew was *not* the right guy. The only reason unzipping the outer jacket to see the sweatshirt proved problematic for Askew is the inconvenient fact that he was illegally carrying a loaded .38 caliber gun under his jacket.

The larger point is that *Hayes* requires only a "reasonable basis for believing" that the identification procedure will establish or negate the suspect's connection with the crime. *Hayes*, 470 U.S. at 817. Given that the robbery victim initially told the police about the blue sweatshirt, how can we say that there is not even a *reasonable basis* for believing that the victim's seeing the blue sweatshirt would have assisted her identification? The majority offers no good answer to that commonsense question.[11]

In our judgment, requiring this kind of pinpoint accuracy and detail in a victim's initial description of a criminal is inconsistent with the *Hayes* "reasonable basis" standard and could place a dangerous burden on law enforcement officials. After all, victims often do not provide such richly detailed descriptions when first reporting violent crimes to the police.

A good indication that Part III(D) rests on quicksand is the fact that Askew himself did not raise this argument either in his submission to the District Court or on appeal, where he was represented by skilled and experienced counsel from the

---

[11] No doubt because there is no good answer to that question, Judge Griffith, notwithstanding his separate opinion's narrower view of what police are permitted to do under the Fourth Amendment, does not join Part III(D) of Judge Edwards's opinion; he agrees with us that, if the *Hayes* standard applies, the facts here meet the *Hayes* test. Concurring Op. of Judge Griffith at 5 n.2.

Federal Public Defender's Office. Defense counsel presumably considered the argument untenable.[12]

In any event, our disagreement with Part III(D) of Judge Edwards's opinion (which on this point is for a majority) is a narrow fact-bound dispute with respect to the record in Askew's specific case. In many future show-up cases, the record indisputably will satisfy the *Hayes* reasonable-basis requirement as described by Part III(D) of that opinion. In such a case, of course, the Court would need to decide the legal issue regarding show-ups that the Court today leaves open.

One final point: The majority's ruling in Part III(D), as we read it, is limited to a witness's viewing clothing at a show-up during a *Terry* stop. The majority does not purport to address or alter long-standing law about what is sufficient to constitute "reasonable suspicion" to stop someone in the first place. If the majority's analysis were to migrate to that context, then it would of course wreak havoc with *Terry* stops more generally. We do not read the majority opinion to open that can of worms. Indeed, various judges in the majority have joined recent opinions suggesting there will be no such

---

[12] The majority opinion notes that Askew alluded to the blue-sweatshirt point in a *footnote* in his *reply brief* to the three-judge panel. Maj. Op. at 37 n.2. The fact that the point appeared in one oblique sentence in a reply-brief footnote speaks for itself in terms of defense counsel's confidence in the point. Moreover, contrary to the majority's suggestion, Askew did not make this point as an alternative argument for reversal, but rather only to illustrate why the Court should not allow any identification searches during *Terry* stops. And even if Askew had offered this as an alternative argument for reversal, this Court of course does not consider alternative arguments for reversal raised for the first time in a footnote in a reply brief.

spillover effect. *See United States v. Abdus-Price*, 518 F.3d 926, 929-31 (D.C. Cir. 2008) (Griffith, J., joined by Ginsburg and Rogers, JJ.); *United States v. Goddard*, 491 F.3d 457, 462 (D.C. Cir. 2007) (per curiam) (Ginsburg and Tatel, JJ.); *see also* Douglas H. Ginsburg, *Of Hunches and Mere Hunches: Two Cheers for* Terry, 4 GEO. MASON J.L. ECON. & POL'Y 79, 84 (2007) ("Under *Terry*, the test for determining whether a police officer had a reasonable suspicion takes account of the 'totality of the circumstances,' which leads courts to review police practices deferentially. As a result, close calls go to the police.") (footnote omitted).

\* \* \*

We would hold that unzipping Askew's jacket to search for a weapon in his waist area was an objectively reasonable protective step to ensure officer safety after Askew's resistance to the initial frisk attempt. In the alternative, we would hold that the police may reasonably maneuver a suspect's outer clothing – such as unzipping a suspect's outer jacket – when, as here, doing so could help facilitate a witness's identification at a show-up during a *Terry* stop. We would uphold the search and affirm the judgment of conviction on either of those two alternative grounds. We respectfully dissent.